[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 04-13065
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DECEMBER 15, 2005
THOMAS K. KAHN
CLERK

D. C. Docket No. 03-21086-CV-JEM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RIGEL SHIPS AGENCIES, INC.,

Defendant-Cross-
Defendant,

GREAT AMERICAN INSURANCE COMPANY OF NEW YORK,
f.k.a. American National Fire Insurance Company,

Defendant-Cross-
Claimant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(December 15, 2005)

Before BIRCH, CARNES and RONEY, Circuit Judges.

**PER CURIAM:**

Defendant-appellant, Great American Insurance Company of New York ("GAIC"), formerly known as American National Fire Insurance Company, appeals an order by the district court granting summary judgment to plaintiff-appellee, United States Customs and Border Protection ("Customs"), as to its attempt to collect on an international carrier bond posted for the lading and unlading of the vessels M/V Sigrid and M/V Sherida Express. This case concerns whether the surety of an international carrier bond should be liable under the bond contract for a penalty imposed by the government against a ship's owner, through its agent, the principal on the bond. We have determined that GAIC, as the surety for the principal, Rigel Ships Agencies, Inc. ("Rigel"), voluntarily assumed liability up to the face amount of the bond, and we AFFIRM.

## I. BACKGROUND

In May 1998, Vektor Trading S.A. owned the cargo vessel, M/V Sigrid. Rigel Ships Agencies ("Rigel") was Vektor's agent and the principal on a $100,000 international carrier bond that Rigel posted for the lading and unlading of the Sigrid upon its entry into Miami from Haiti. GAIC was the surety for Rigel on that bond. In June 1998, Golden Shipping owned the cargo vessel, M/V Sherida

2

Express. As Golden Shipping's agent, Rigel posted the same bond as for the Sigrid for the lading and unlading of the Sherida Express.

In each case, Rigel notified Customs, by way of filing a Form 3171,[1] that the ship in question would be arriving in Miami from Haiti. When each vessel arrived, the manifest provided to Customs showed that the ship carried no cargo. Customs officials inspected each ship and found approximately 462.5 pounds of cocaine concealed within the Sigrid and approximately 102.4 pounds of cocaine concealed within the Sherida Express.

The government issued a notice of civil penalty to each shipowner, in care of Rigel, their agent, stating that Vektor and Golden Shipping had violated 19 U.S.C. §§ 1584, 1433, and 1436 in relation to the proffered manifests for the Sigrid and the Sherida Express respectively. Pursuant to 19 U.S.C. § 1584(a)(2), the government assessed a penalty – $7,400,000 for the Sigrid and $1,638,400 for the Sherida Express – representing $1000 for each ounce of cocaine found on the ship and not included in the ship's manifest.

By letters dated 21 June 1998 and 10 August 1998, Vektor and Rigel acknowledged receipt of the notice related to the Sigrid but requested remission of the penalty. On 22 July 2000, the government agreed to mitigate the penalty to

---

[1]Customs Form 3171 is an application for, inter alia, entry, clearance, lading and unlading of a vessel.

$3,700,000 and demanded payment within thirty days. No payment was made. Consequently, on 29 September 2000, the government sent notice of the civil penalty to GAIC and demanded payment of $100,000, the value of the international carrier bond. GAIC made no payment. On 30 April 2003, the government filed suit pursuant to 19 U.S.C. § 1584 in the Southern District of Florida against GAIC and Rigel to recover the civil penalty secured by the bond. GAIC cross-claimed against Rigel. Subsequently, GAIC moved for summary judgment. The government also moved for summary judgment.

Similarly, on 12 August 1998, Rigel acknowledged the assessment of a penalty in connection with the Sherida Express and requested remission. Customs mitigated the penalty in that case to $819,000 and demanded payment within 30 days. No payment was ever made, and the government filed suit to collect from GAIC on the bond.

After nearly a year of confusion between the two highly similar records, the district court consolidated the two cases. The court granted summary judgment in favor of the government as to the liability of GAIC with respect to the civil penalty arising from the cocaine found on the Sigrid. The court directed the parties to proceed as to the matter of the Sherida Express insofar as it might involve new or different legal issues from the other case. The government filed a motion for

4

summary judgment, and GAIC filed a motion for partial summary judgment against Rigel.  The district court granted the government's motion for summary judgment as to the Sherida Express and GAIC's motion for partial summary judgment against Rigel.  GAIC has timely appealed the grant of summary judgment in favor of the government.

On appeal, GAIC argues that the district court erred in granting summary judgment in favor of the government in that: (1) GAIC is not liable for the misconduct of the vessels' masters or owners because their conduct was not within the contemplation of the surety at the formation of the bond contract; (2) statutory authority for the bond requirement is faulty in that 19 U.S.C. § 1623 does not authorize Customs to demand a bond from international carriers that guarantees payment of penalties for violation of 19 U.S.C. § 1584(a)(2), and such a requirement would be contrary to the Non-Delegation Doctrine and to the Due Process and Equal Protection Clauses; (3) there is a genuine issue of material fact as to whether Rigel disclaimed liability for penalties when it obligated its bond with regard to the lading and unlading of the Sigrid; and (4) the owners and masters were indispensable parties pursuant to Fed. R. Civ. P. 19 and the suits should have been dismissed because those parties were not joined.[2]

---

[2]GAIC also argues that, despite the existence of two violations, it can only be liable for a total of $100,000 – the face amount of the bond – because both incidents occurred in the same

## II. DISCUSSION

A. Standard of Review and Governing Law

"We review a grant of summary judgment de novo, applying the same standard as the district court." Korman v. HBC Fla., Inc., 182 F.3d 1291, 1293 (11th Cir. 1999). We draw all inferences in favor of the non-moving party. Id. "We will affirm a grant of summary judgment only if no genuine issues of material fact exist and only if the moving party is entitled to judgment as a matter of law." Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1532 (11th Cir. 1992).

Customs statutes and regulations require that, within forty-eight hours "after the arrival at any port or place in the United States of . . . any vessel from a foreign port or place, . . . the master of the vessel shall . . . make formal entry at the nearest customs facility." 19 U.S.C. § 1434(a)(1); 19 C.F.R. § 4.3 (1998).[3] Such a vessel must also have a manifest. 19 U.S.C. § 1431(a). That manifest must accurately reflect "inward foreign cargo on board regardless of the port of discharge." 19 C.F.R. § 4.7a(c)(1) (1998); see also 19 C.F.R. § 4.7(a) (1998). An inaccurate

---

year. Appellant's Br. at 49-50. The government, correctly, concedes this point. Appellee's Br. at 32.

[3]Citations are to current versions of the United States Code and the Code of Federal Regulations unless the provisions cited were substantively amended subsequent to the spring and summer of 1998, in which case the version cited is indicated.

manifest may result in civil penalties charged against the master, owner, or person in charge of the vessel. 19 U.S.C. § 1584(a)(1).

Under 19 U.S.C. § 1623(a) the Secretary of the Treasury may impose a bond requirement "to assure compliance with any provision of law, regulation, or instruction which the Secretary of the Treasury or the Customs Service may be authorized to enforce." The Secretary may impose such a requirement either by regulation or by specific instruction "[i]n any case in which bond or other security is not specifically required by law." Id. Further, the statute permits Customs to require a bond as security for the payment of any "penal sum." 19 U.S.C. § 1623(b)(1).

In this case, the Secretary has required, by regulation, that "no passengers, cargo, baggage, or other article shall be unladen from a vessel which arrives directly or indirectly from any port or place outside the Customs territory of the U.S., . . . until the port director shall have issued a permit or special license therefore on Customs Form 3171." 19 C.F.R. § 4.30(a) (1998). Further, no such permit shall be issued unless "the required cash deposit or bond has been filed on Customs Form 301, containing the bond conditions set forth in § 113.64 of this chapter relating to international carriers." 19 C.F.R. § 4.30(c) (1998). Among other things, that referenced regulation requires that "[i]f any vessel . . . or any

master, owner, or person in charge of a vessel . . . incurs a penalty, duty, tax, or other charge provided by law or regulation, the obligors (principal and surety, jointly and severally) agree to pay the sum upon demand by Customs." 19 C.F.R. § 113.64(a) (1998). Finally, a surety on a Customs bond owes an obligation primarily to the United States government, not to the principal, or to any person or other entity on behalf of which the principal obligates the bond. United States v. E.C. McAfee Co., 19 Ct. Int'l Trade 1243, 1244, 901 F. Supp. 367, 369 (1995).

B. Contractual Scope of Coverage

GAIC's first argument, that it did not contemplate the risks associated with guaranteeing the payment of penalties that might be assessed against anyone other than Rigel, lacks merit. In the case of the Sigrid, Rigel completed Form 3171 on behalf of the ship's owner, Lektor. In the case of the Sherida Express, Rigel completed Form 3171 on behalf of the ship's owner, Golden Shipping. Neither ship would have been allowed entry to any United States port without Form 3171, and neither could have successfully completed that form without securing the required bond. In each case, the Form 3171 refers to a continuous bond in the amount of $100,000 held by "Rigel Ships-Agencies, Inc" with "Surety Company Code 097." R1(Sigrid)-1, Exh. A; R1(Sherida Express)-1 Exh. A. The corresponding Form 301 has an "X" marked in the box indicating that the bond in

8

question is an "international carrier" bond pursuant to § 113.64. R1(Sigrid)-1, Exh. B; R1(Sherida Express)-1 Exh. B. This Form 301 also lists Rigel as the principal and GAIC (identified also as "Surety No. 097)" as the surety. R1(Sigrid)-1, Exh. B; R1(Sherida Express)-1 Exh. B. Representatives of both Rigel and GAIC signed the Form 301 creating the underlying bond. By filing Customs Form 3171 on behalf of the Sigrid and the Sherida Express, Rigel voluntarily obligated this bond on behalf of these vessels' owners.[4]

The language on the face of the bond (Form 301), which GAIC signed, also clearly contemplates that the bond will be "obligated" in favor of third parties where it gives space for the principal to list entities permitted so to obligate the

---

[4]Prior to 11 September 2001, many carriers borrowed their agents' bonds in this way. Because no international carrier could unload without a bond, smaller shippers tended to go to larger shipping companies or shipping agents to get a bond to use for themselves. These agents, to help garner business for themselves, agreed to obligate their bonds in favor of smaller shippers. The agents would then apply for permission on behalf of the smaller shipper, to enter the port, and to lade and unlade cargo. Customs granted entry to these ships in reliance on these bonds. It made no difference to Customs who obligated the bond, as long as it would serve to protect government interests in enforcing customs laws and regulations. Such a bond does not make either the principal bond holder or the surety criminally responsible for the cocaine, or other unmanifested cargo, it merely puts them jointly and severally at risk up to the face value of the bond for any civil penalty imposed in relation thereto. See Lumbermens Mut. Cas. Ins. Co. v. Darel Group U.S.A. Inc., 253 F. Supp. 2d 578, 580-81 (S.D.N.Y. 2003) (involving a bond executed in 1999 in favor of a shipping-agent principal which, in turn, obligated it on behalf of a ship carrying concealed cocaine upon which basis that ship was assessed penalties for which the surety was then liable).

The Maritime Transportation Security Act of 2002, Pub. L. No. 107-295, 116 Stat. 2064 (codified in scattered sections of Titles 14, 16, 33 and 46 of the United States Code), put an end to this practice; each carrier must now have its own bond. At the time the incidents at issue took place, however, neither the Sigrid nor the Sherida Express had a bond of its own. Neither could enter any United States port without such a bond. Each was allowed to borrow the bond obtained by Rigel upon which GAIC was the surety.

bond in its name.  See R1(Sigrid)-1, Exh. B at "Section III"; R1(Sherida Express)-1 Exh. B at "Section III."  Further, because Rigel owns no vessels of its own, it should have been clear to GAIC, that GAIC was assuming risk regarding the actions of third parties.

In sum, the regulatory scheme defines the risk assumed by the surety.  The box checked on Form 301 in this case specifically indicates that Rigel and GAIC were posting an international carrier bond  pursuant to 19 C.F.R. § 113.64.  See R1(Sigrid)-1, Exh. B at "Section II," box 3; R1(Sherida Express)-1 Exh. B at "Section II," box 3.  The referenced regulation specifies that the bond covers penalties or other charges assessed against the vessel, master, owner or person in charge of the vessel.  19 C.F.R. § 113.64(a).  In signing Form 301, GAIC voluntarily agreed to provide a bond covering the activities of those third parties. Any other interpretation would leave GAIC without any real exposure to liability and the transaction would make no sense.

C. Statutory Authority for Bond Requirement

1. Interpretation

GAIC next makes three arguments challenging the statutory authority for a Customs bond requirement in these circumstances.  First, GAIC contends that 19 U.S.C. § 1584(a)(2), the statute under which the penalty was assessed, does not

10

contemplate that the penalty be paid by an international carrier bond but by an outbound vessel clearance bond. In any question of statutory interpretation, "[w]e do not look at one word or term in isolation, but instead we look to the entire statutory context." United States v. DBB, Inc., 180 F.3d 1277, 1281 (11th Cir. 1999). Through 19 U.S.C. § 1584, Congress imposes penalties for false or incomplete manifests. This statute further provides that the penalty imposed when merchandise found not included on a manifest consists of cocaine or other controlled substances constitutes a lien on the vessel and that clearance of any vessel to leave "may be withheld until such penalties are paid or until a bond . . . is given for the payment thereof." 19 U.S.C. § 1584(a)(2).

The argument, that this provision for an outbound clearance bond forestalls the payment of penalties by an international carrier bond, lacks merit. If a clearance bond were the only bond Customs could require with respect to payment of a § 1584(a)(2) penalty, and Customs seized a drug-carrying vessel the value of which was insufficient to cover the penalty imposed, then the vessel owner could simply choose not to seek the return of the vessel and avoid paying a substantial portion of that penalty. By requiring an international carrier bond for a vessel's lading and unlading upon entry, and thereby placing liability on the obligors for a penalty provided by law, Customs assures compliance with, among other laws, 19

11

U.S.C. §§ 1431(a), 1433(d) and 1584, and guarantees that at least the bond amount will be paid in the event a penalty is incurred.

Further, the language of § 1584 states only that Customs "may" withhold clearance until the penalty is paid or a bond is given, it does not make the bond mandatory. 19 U.S.C. § 1584(a)(2). Thus, the requirement of an international carrier bond does not run afoul of the portion of 19 U.S.C. § 1623 authorizing the imposition of a bond requirement only where no bond is otherwise required by law. See 19 U.S.C. § 1623(a). Considering the entire regulatory scheme, it is clear that Customs intended the international carrier bond to ensure payment of penalties imposed, among other things, for failure to manifest cargo under § 1584(a)(2).[5]

2. Non-Delegation Doctrine

GAIC next argues that the international carrier bond requirement for entry offends the Non-Delegation Doctrine. GAIC specifically asserts that Customs has improperly construed 19 U.S.C. § 1623, arguing that Congress did not intend to permit the requirement of an international carrier bond to secure payment of

---

[5]GAIC also argues that the use of the international carrier bond to satisfy a drug-trafficking penalty under § 1584 (a)(2) is irrational because the bond amount is often less than the amount of the penalty. Customs has discretionary authority to determine the amount of the bond, provided it is not less than $100. 19 C.F.R. § 113.13(a). The exercise of discretionary authority to set Rigel's bond at an amount lower than the penalties in this case only worked to Rigel and GAIC's benefit. That exercise of discretion may not stand in support of the argument that the bond was not intended to cover the risk that a greater penalty might be imposed.

12

prospective penalties. This argument fails because § 1623(b)(1) expressly states that Congress may require a bond "for the payment of . . . a penal sum." Therefore, Customs is authorized to require posting of a bond and to collect on those bonds when, as in this case, the violation of a statute has given rise to the imposition of a penalty.

Further, Congress has specified the purposes for which Customs may impose such a requirement: "for the protection of the revenue or to assure compliance with any provisions of law, regulation, or instruction which the Secretary of the Treasury or the Customs Service may be authorized to enforce." 19 U.S.C. § 1623(a). The United States Court of International Trade has recognized that "[t]he grant of authority for requiring bonds and setting their amount is strongly stated and comprehensive." Hera Shipping, Inc. v. Carnes, 10 Ct. Int'l Trade 493, 496, 640 F. Supp 266, 269 (1986). Although Congress cannot delegate essential legislative functions, the Supreme Court has reaffirmed that:

> [T]he Constitution has never been regarded as denying to Congress the necessary resources of flexibility and practicality, which will enable it to perform its function in laying down policies and establishing standards, while leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the Legislature is to apply.

13

A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 530, 55 S. Ct. 837, 843 (1935).  Because Congress has prescribed the general standards to which the Secretary must adhere and has clearly determined that bonds may be required to enforce laws and Customs regulations, GAIC's non-delegation argument is meritless.

3. Due Process and Equal Protection

Finally, GAIC contends that the bond requirement offends due process and equal protection under the Constitution because it results in deprivation of life, liberty or property without due process of law and because it discriminates against small businesses.  A party raising a due process challenge is required to show that the challenged legislation "is rationally related to a lawful government purpose and is not unlawfully arbitrary or discriminatory." United States v. Plummer, 221 F.3d 1298, 1308-09 (11th Cir. 2000).  We have explained that this "test is generally easily met" by asking "if any set of facts may be reasonably conceived to justify [the regulation]." Id. at 1309.

Through 19 U.S.C. § 1623, Congress authorizes the Secretary of the Treasury to use bonds to ensure compliance with Customs laws pertaining to the flow of goods into the United States.  The Supreme Court has explained the propriety of allowing the government, under certain circumstances, to place

14

controls on private businesses to protect the public welfare. <u>Nebbia v. New York</u>, 291 U.S. 502, 521-24, 537, 54 S. Ct. 505, 509-11, 516 (1934) (price controls on milk did not violate due process where imposed for public good).

Government control over the flow of goods, including the flow of illegal drugs, into the country is vital to the public welfare. Imposing civil penalties for failure to manifest, especially of illegal drugs, and requiring vessel owners to post bonds to ensure such penalties are paid is a reasonable method of addressing this concern. The requirement that an international carrier bond be posted upon entry is neither arbitrary nor capricious and is rationally related to stemming the flow of illegal drugs into United States ports. Finally, this bond requirement applies to all vessels and, thus, is not discriminatory. Accordingly, it does not offend due process requirements.

With respect to GAIC's equal protection argument, the bond requirement is imposed on all vessel owners who ship cargo to the United States, regardless of the size of their business or their country of origin. Although a bond of at least $100 will be required, the actual amount of the bond required in each case is determined by, among other factors, the value and nature of the merchandise shipped as well as by a vessel's prior record in meeting payment obligations. 19 C.F.R. § 113.13(a), (b)(3), (5). Thus, a vessel owner moving a less valuable cargo would likely not be

15

required to post the same bond amount as a larger business regularly moving very valuable cargo. Because all vessel owners must fulfill the bond requirement, equal protection principles are not violated.

C. Rigel's Alleged Disclaimer as to Penalties

GAIC next challenges its liability under the bond agreement by pointing to a disclaimer allegedly submitted by Rigel along with the rest of the entry documents. The district court found insufficient evidence of a valid disclaimer to consider this argument. R1(Sigrid/Consolidated)-42 at 6, n.2; Id. 26 at 7 n.5. "We review the district court's findings of fact for clear error . . . ." Kentov v. Sheet Metal Workers' Int'l Ass'n Local 15, AFL-CIO, 418 F.3d 1259, 1262 (11th Cir. 2005). "Clear error is a highly deferential standard of review. As the Supreme Court has explained, a finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Holton v. City of Thomasville Sch. Dist., 425 F.3d 1325, 1350-51 (11th Cir. 2005) (citations and quotations omitted).

In finding no valid disclaimer, the court observed that GAIC had "not offered any evidence demonstrating that the disclaimer [was] authentic or otherwise admissible." R1(Sigrid/Consolidated)-42 at 6, n.2; Id. 26 at 7 n.5. Even

16

if the disclaimer had been included when Rigel presented the lading and unlading documents, the court noted that there was "no evidence that Customs accepted the disclaimer, adopted it, or otherwise agreed to it." Id. 42 at 6, n.2; Id. 26 at 7 n.5. There is no indication on the face of Form 301 of any modification of the terms of the bond, which clearly incorporates all conditions set out in 19 C.F.R. § 113.64. Finally, such a disclaimer would essentially negate the purpose of the bond, which Customs required to be posted in this case. We find no error. GAIC's argument as to the disclaimer must fail.

E. Rule 19 Joinder

GAIC finally contends that summary judgment should not have been granted because the district court failed to join the vessel owners and masters as indispensable parties in the lawsuit. We review a district court's decision regarding indispensability of parties for abuse of discretion. Mann v. City of Albany, Ga., 883 F.2d 999, 1003 (11th Cir. 1989). "A district court abuses its discretion when, in reaching a decision, it applies an incorrect legal standard, follows improper procedures in making the determination, or makes findings of fact that are clearly erroneous. S.E.C. v. Smyth, 420 F.3d 1225, 1230 (11th Cir. 2005) (citations and quotations omitted).

Federal Rule of Civil Procedure 19 "provides a two-step test for determining whether an action should proceed" in the absence of a non-party.  City of Marietta v. CSX Transp., Inc., 196 F.3d 1300, 1305 (11th Cir. 1999).[6]  "The first question is whether complete relief can be afforded in the present procedural posture, or whether the nonparty's absence will impede either the nonparty's protection of an interest at stake or subject parties to a risk of inconsistent obligations."  Id.  If the answer to this first question is "no," we do not reach part two.  Id.

In this case, as the district court apparently recognized, complete relief by recovery under the bond can be had without joining the owners or masters. Customs filed an action against GAIC for collection of the amount due pursuant to contract, the international carrier bond.  All that is required for GAIC to become liable under the bond is (1) the vessel owner's breach of 19 U.S.C. § 1584; (2) the assessment of a penalty; and (3) the owner's failure to pay that penalty.  See 19 C.F.R. § 113.64.[7]  As a practical matter, failing to join the owners or masters does not impede GAIC's ability to protect its interests or leave it open to multiple

---

[6]This opinion was later amended to conform to an answer to a question – unrelated to the point of law at issue here – that had been earlier certified to the Supreme Court of Georgia.  See City of Marietta v. CSX Transp., Inc., 225 F.3d 1283 (11th Cir. 2000).  The law relevant to this case is undisturbed by the amendment.

[7]The regulation does not require that Customs demand payment from the vessel owner or master prior to making a demand on the principal and surety.  Customs did so anyway in this case, and both vessel owners failed to pay the penalties.

18

liability. GAIC is free to pursue indemnity from Rigel and has done so. Accordingly, the answer to the first question should have been and was "no," and we do not reach step two. There was no abuse of discretion and GAIC's Rule 19 argument is unavailing.

### III. CONCLUSION

GAIC's appeal of the district court's grant of summary judgment in favor of the government as to its attempt to collect on an international carrier bond posted with Customs for the lading and unlading of the Sigrid and the Sherida Express lacks merit. GAIC was paid a premium for providing coverage of this bond, and because Rigel has no ships of its own, the only way GAIC could have exposure to liability would be through the actions of third parties. The penalty imposed pursuant to 19 U.S.C. § 1584 is exactly the kind of penalty the regulation defining the conditions of the international carrier bond was intended to cover. GAIC voluntarily assumed the risk for this penalty. There was no valid disclaimer and all indispensable parties participated in the law suit. Accordingly, we **AFFIRM** the order of the district court granting summary judgment in favor of the government, confirming GAIC's liability to the extent of the $100,000 face amount of the international carrier bond.

**AFFIRMED.**