[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 12-14527; 12-14742; 12-14825; 13-10891; 13-12735; 13-12736
_____

D.C. Docket Nos. 9:11-cv-80601-DMM, 9:11-cv-80638-DMM


WINN-DIXIE STORES, INC.,
WINN-DIXIE STORES LEASING, LLC, et al.,

                    Plaintiffs - Appellants,

versus

DOLGENCORP, LLC,
f.k.a. Dolgencorp, Inc,
a Kentucky corporation,

                    Defendant - Appellee.


_____

D.C. Docket No. 9:11-cv-80638-DMM


WINN-DIXIE STORES, INC.,
WINN-DIXIE STORES LEASING, LLC, et al.,

                    Plaintiffs - Appellants
                    Cross Appellees,

versus

DOLLAR TREE STORES, INC.,
a Virginia corporation,

Defendant - Appellee
Cross Appellant.

_____

D.C. Docket No. 9:11-cv-80641-DMM

WINN-DIXIE STORES, INC.,
WINN-DIXIE STORES LEASING, LLC, et al.,

Plaintiffs - Appellants
Cross Appellees,

versus

BIG LOTS, INC.,
an Ohio corporation,

Defendant - Appellee
Cross Appellant.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(March 5, 2014)

2

Before MARCUS and FAY, Circuit Judges, and HODGES,* District Judge.

MARCUS, Circuit Judge:

When a Winn-Dixie supermarket signs on to anchor a shopping center, its lease often contains a restrictive covenant sharply limiting grocery sales by other tenants. In this complex lawsuit, Winn-Dixie claimed that, since 2005, it suffered more than $90 million in lost profits because Defendants Dollar General, Dollar Tree, and Big Lots violated, and continue to violate, these restrictive covenants. Trial involved ninety-seven of Defendants' stores across five southeastern states. The district court handled this complicated case with thought and skill.

For fifty-four stores, the district court reached the question of whether the Defendants violated the terms of the restrictive covenants, whose standard language for most stores limited the sale of "staple or fancy groceries" to a discrete "sales area." Applying general principles of Florida law, the district court construed these terms narrowly, reading groceries as only food items and measuring sales area only by shelving space. As a result, the court refused to order injunctions for thirty-seven stores where it found no violation of the terms of the covenants. As for the seventeen other stores, the court issued injunctive relief that limited only the sale of food items measured by shelving space. Being Erie-bound

---

* Honorable Wm. Terrell Hodges, United States District Judge for the Middle District of Florida, sitting by designation.

to apply state rules of decision in this diversity jurisdiction case, we must reverse and remand as to the fifty-four stores. We do so for forty-one of these stores found in Florida, compelled by an intermediate appellate decision from that state interpreting a restrictive covenant materially identical to many of those at issue here. See Winn-Dixie Stores, Inc. v. 99 Cent Stuff-Trail Plaza, LLC, 811 So. 2d 719 (Fla. 3d DCA 2002). As we read controlling Florida law, "groceries" broadly includes food and "many household supplies (as soap, matches, paper napkins)," and sales area "includes fixtures and their proportionate aisle space." Id. at 722 (emphasis added). Also, for eleven stores in Alabama and two found in Georgia, we are required to reverse and remand for interpretation of the covenant terms in accordance with the appropriate law of each of those states.

For the remaining forty-three stores, the district court denied all relief for a variety of reasons, without deciding whether the Defendants had violated covenant terms. Finding no error, we affirm the judgment of the district court as to these forty-three stores. To begin with, the district court acted well within its considerable discretion in excluding the testimony of Dr. Pacey, Winn-Dixie's expert on damages, based on twin findings that the expert opinion would not assist the trier of fact and was not grounded in reliable methodology. As a result, the court made no error in refusing to award compensatory damages as to any of the stores. Nor did the court err in finding that the restrictive covenants were

4

unenforceable under the laws of Louisiana and Mississippi, or in refusing to allow Winn-Dixie to enforce a covenant in a grocery store lease created after a Defendant's lease had been signed.  Moreover, the trial court made no error in refusing to recognize collateral estoppel because this case involves different stores with different leases signed at different times from the lease for the one store at issue in the prior Florida decision.  And the district court did not abuse its discretion in denying punitive damages because a legitimate dispute about the meaning of the grocery exclusives indicated that the Defendants did not intentionally engage in misconduct or act in a grossly negligent manner.

The cross-appeals lodged by Big Lots and Dollar Tree lack merit.  As the district court concluded, Big Lots need not have signed the restrictive covenants to be bound by them because section 542.335 of the Florida Statutes does not apply to covenants running with the land.  The district court also properly concluded that Big Lots' landlords were not indispensable parties under Federal Rule of Civil Procedure 19(a)(1), and that Winn-Dixie was not required to make a pre-suit demand for compliance upon Big Lots under Florida law.  Finally, the district court did not err in granting summary judgment against Dollar Tree's statute of limitations affirmative defense; in Florida, a continuing violation principle applies because the Defendants' stores engaged in ongoing grocery sales.

5

Thus, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

I.

Plaintiffs ("Winn-Dixie") own or operate roughly 500 supermarkets or grocery stores on leased property throughout Alabama, Florida, Georgia, Louisiana, and Mississippi.  Most of their stores are found in Florida.  Defendants, in turn, run discount general merchandise stores, some of which are colocated in shopping centers featuring a Winn-Dixie supermarket as an anchor tenant. Dolgencorp, LLC ("Dollar General") is a Kentucky limited liability company with over 9,600 stores in 36 states.  Dollar Tree Stores, Inc. ("Dollar Tree") is a Virginia corporation that operates more than 4,400 stores in 48 states.  Big Lots Stores, Inc. ("Big Lots") is an Ohio corporation that runs over 1,400 stores in 48 states.

Winn-Dixie's commercial leases often include a "grocery exclusive" provision that precludes landlords from renting to other tenants who operate grocery stores in the same shopping center.  Many of the leases specify that these tenants may devote a limited "sales area" to certain restricted products, including "staple or fancy groceries."  Winn-Dixie argued that these grocery exclusives bind subsequent tenants as covenants running with the land.  Based on reports of estimated sales activity compiled by its investigators, Winn-Dixie concluded that a number of colocated Dollar General, Dollar Tree, and Big Lots stores operate in

6

violation of the restrictive covenants created by the grocery exclusives.  Not surprisingly, the parties vigorously dispute which products are restricted and how the permissible sales space is measured.

On May 20, 2011, Winn-Dixie sued Dollar General in the United States District Court for the Southern District of Florida.  Two weeks later, Winn-Dixie filed separate suits against Big Lots and Dollar Tree in the same court.  Winn-Dixie initially identified 136 stores in all as being in violation of the restrictive covenants.  Of these original claims, Winn-Dixie at trial pursued its rights as to only ninety-seven stores: fifty-one Dollar General,[1] thirty-two Dollar Tree,[2] and

---

[1] The stores at issue in this case are identified by the corporate numbers of the colocated stores. For example, Dollar General #246, colocated with Winn-Dixie #478, is signified as "DG246/WD478."  The fifty-one Dollar General stores at issue are: DG246/WD478; DG626/WD1537; DG770/WD1540; DG1026/WD1511; DG1056/WD489; DG1095/WD209; DG1322/WD612; DG1333/WD151; DG1382/WD30; DG1389/WD710; DG1402/WD2260; DG1413/WD631; DG1416/WD622; DG1420/WD611; DG1421/WD144; DG1451/WD723; DG1453/WD662; DG1456/WD331; DG1493/WD647; DG1513/WD2326; DG1522/WD2268; DG1524/WD566; DG1541/WD629; DG1649/WD2342; DG2363/WD411; DG2634/WD777; DG2685/WD1572; DG2762/WD652; DG2965/WD428; DG2969/WD681; DG3013/WD713; DG4008/WD553; DG4444/WD2213; DG4701/WD649; DG4821/WD3; DG4952/WD599; DG4981/WD221; DG7268/WD123; DG7376/WD737; DG7457/WD167; DG7539/WD577; DG7584/WD639; DG7824/WD1588; DG7883/WD305; DG8551/WD561; DG8665/WD579; DG9149/WD750; DG9263/WD705; DG10357/WD1431; DG10484/WD654; DG11814/WD574.

[2] DT153/WD463; DT332/WD2311; DT582/WD166; DT723/WD254; DT807/WD657; DT892/WD2230; DT986/WD737; DT1135/WD116; DT1566/WD228; DT1805/WD705; DT2117/WD353; DT2159/WD309; DT2160/WD443; DT2161/WD1555; DT2395/WD461; DT2714/WD2205; DT2804/WD84; DT2838/WD412; DT2936/WD599; DT3382/WD514; DT4133/WD456; DT4181/WD678; DT4199/WD255; DT4230/WD656; DT4266/WD501; DT4339/WD632; DT4365/WD236; DT4497/WD378; DT4511/WD647; DT4550/WD658; DT4625/WD577; DT4637/WD471.

fourteen Big Lots.[3]  The ninety-seven stores were located predominantly in Florida (seventy-five stores), but also in Alabama (thirteen), Louisiana (six), Georgia (two), and Mississippi (one).  Winn-Dixie sought damages or, in the alternative, injunctive relief.  The Defendants in turn filed third-party complaints against a number of shopping center landlords seeking indemnification, but those third-party actions are not at issue in this appeal.

For ninety-one of the ninety-seven locations at issue, a standard grocery exclusive in Winn-Dixie's lease included the following critical terms:

> Landlord further covenants and agrees not to permit or suffer any property located within the shopping center to be used for or occupied by any business dealing in or which shall keep in stock or sell for off-premises consumption any staple or fancy groceries, meats, fish, vegetables, fruits, bakery goods, dairy products or frozen foods without written permission of the Tenant.

Winn-Dixie Stores, Inc. v. Big Lots Stores, Inc., 886 F. Supp. 2d 1326, 1336 (S.D. Fla. 2012).  Of these ninety-one standard grocery exclusives, seventy-eight contain the following exception:

> [E]xcept the sale of such items is not to exceed the lesser of 500 square feet of sales area or 10% of the square foot area of any storeroom within the shopping center, as [an] incidental only to the conduct of another business . . . shall not be deemed a violation hereof.

---

[3] BL505/WD506; BL512/WD2210; BL525/WD698; BL530/WD654; BL550/WD609; BL553/WD236; BL554/WD671; BL555/WD307; BL558/WD160; BL570/WD612; BL1519/WD306; BL1628/WD348; BL1711/WD302; BL4258/WD254.  **[DE 622.]**

8

Id. (alterations in original).  Of the remaining thirteen standard grocery exclusives, five include similar language that allows up to 1,000 square feet of restricted products; three allow up to 400 square feet; and five do not allow the sale of any such items.

Winn-Dixie sought summary judgment against each of the Defendants, which the district court granted in part and denied in part.  The court found that the grocery exclusives formed valid and enforceable covenants running with the land under Florida law, but that genuine issues of material fact remained as to the meaning of "groceries" and "sales area."  On February 1, 2012, the court consolidated Winn-Dixie's actions against Dollar General, Dollar Tree, and Big Lots.

After many more motions were filed, the district court entered a pretrial "Omnibus Order Concerning the Meaning of the Terms 'Groceries' and 'Sales Area.'"  The court found that both the terms "staple or fancy groceries" and "sales area" were ambiguous as used in the grocery exclusives.  Ultimately, applying Florida principles of real covenant interpretation, the court construed the restrictions narrowly, determining that the parties intended "staple or fancy groceries" to mean only food items, including nonalcoholic beverages, and "sales area" to include only the footprint of the display unit, excluding aisle space.  As a result, the evidence presented at trial was premised on these definitions, and the

9

court found covenant violations only when Defendants sold food items in excess of the allowable shelving space.

Also before trial, the court excluded the testimony of Winn Dixie expert Dr. Patricia Pacey, an economist who intended to opine as to damages. The Defendants did not challenge Dr. Pacey's qualifications, which included a Ph.D. in economics and extensive statistical experience. Based on data drawn from almost 500 Winn-Dixie stores and over 12,000 potential nearby competitors, Dr. Pacey employed a multiple regression model to determine whether a competitor selling similar grocery products in proximity to a Winn-Dixie store has an effect on Winn-Dixie sales. Because the Defendants' stores generally do not sell meat, Dr. Pacey calculated the effect of the Defendants' presence on Winn-Dixie non-meat grocery sales. After equalizing other factors, Dr. Pacey claimed that the presence of a Big Lots, Dollar General, or Dollar Tree store within two-tenths of a mile of a Winn-Dixie was correlated with a reduction in non-meat grocery sales of 7.7%, 6.7%, and 5.0%, respectively. Dr. Pacey used these suppression numbers to calculate the monetary damages allegedly sustained by each Winn-Dixie store. However, the district court barred her testimony, finding its methodology was unreliable and that it would not assist the trier of fact. The court concluded that her analysis failed to reconcile that most of Defendants' stores were permitted to sell a certain amount of restricted products and that it did not establish causation between a covenant

10

violation and decreased Winn-Dixie profits.  The district court also took issue with the methods underlying her regression analysis, which calculated damages from 2005 to 2008 based on recession-period sales data drawn from 2009 and 2010, measured Winn-Dixie foot traffic by assuming that consumers purchase their groceries and meat at the same store, imposed an arbitrary three-mile outer radius to measure competition, alleged damages for items that the Defendants do not sell, and had not been peer-reviewed.

The district court conducted a bench trial from May 14 until May 22, 2012. On August 13, it issued detailed "Findings of Fact and Conclusions of Law."  The court determined that the leases created enforceable restrictive covenants under the laws of Florida, Georgia, and Alabama, but that the grocery exclusives could not be enforced in Louisiana, under that state's civil law, or in Mississippi, because privity of estate was lacking.  The district court refused to award any compensatory damages, however, because the evidence of harm presented by Winn-Dixie was "too general, vague, and speculative."  The court also denied punitive damages, finding no "intentional misconduct" or "gross negligence" because "[t]he grocery exclusives . . . are rife with ambiguities and the scope of their restrictions are uncertain at best," and because Winn-Dixie did not make a formal demand on Defendants to comply prior to filing suit.

11

Turning to Winn-Dixie's request for injunctive relief, the district court determined that, with Dr. Pacey's testimony off the table, a remedy at law was inadequate because of its "skepticism that Plaintiffs could ever provide sufficient evidence to be entitled to an award of damages." However, the court granted injunctive relief only if a Defendant's store violated a narrowly construed restrictive covenant.

For a number of reasons, the district court found that injunctive relief was unavailable at forty-three stores regardless of whether Defendants had violated the terms of the grocery exclusives. Thirty-one stores had closed, making an injunction unnecessary.[4] The court awarded no relief as to the six stores in Louisiana[5] and one in Mississippi,[6] where the covenants were unenforceable. For one store, Dollar General's lease predated the restrictive covenant; thus, the court determined that the subsequent restrictive covenant was not enforceable.[7] For four

---

[4] BL570/WD612; DG1095/WD209; DG1322/WD612; DG1333/WD151; DG1382/WD30; DG1389/WD710; DG1402/WD2260; DG1413/WD631; DG1421/WD144; DG1451/WD723; DG1456/WD331; DG1493/WD647; DG1513/WD2326; DG1522/WD2268; DG1524/WD566; DG1649/WD2342; DG2363/WD411; DG2762/WD652; DG3013/WD713; DG4008/WD553; DG4444/WD2213; DG4701/WD649; DG4821/WD3; DG4981/WD221; DG7457/WD167; DG7539/WD577; DG7584/WD639; DG7883/WD305; DG9149/WD750; DG10484/WD654; DT1135/WD116.

[5] DG626/WD1537; DG770/WD1540; DG2685/WD1572; DG7824/WD1588; DG10357/WD1431; DT2161/WD1555.

[6] DG1026/WD1511.

[7] DG1420/WD611.

stores with nonstandard covenants, the court concluded it could not craft a specific, detailed injunction that satisfied the requirements found in Federal Rule of Civil Procedure 65(d).[8]  In relevant part, Rule 65(d)(1) requires that "[e]very order granting an injunction . . . must . . . (B) state its terms specifically; and (C) describe in reasonable detail . . . the act or acts restrained or required."  Fed. R. Civ. P. 65(d)(1).

At the remaining fifty-four stores, the district court reached the question of whether the Defendants had violated the narrowly construed covenants.  The court checked for violations by looking to reports from Winn-Dixie investigators that estimated grocery sales areas for the stores at issue -- again, counting only food items and shelving space.  For thirty-seven stores, these reports showed no violation and the court entered no injunction.[9]  For six stores, the investigator reports indicated that restrictive covenants were violated by less than fifty square

---

[8] BL554/WD671; DG7268/WD123; DG9263/WD705; DT 1805/WD705.  For DG9263/WD705, the district court also concluded, alternatively, that it could not enforce a grocery exclusive contained in a nonstandard cross-easement.

[9] BL505/WD506; DG246/WD478; DG1056/WD489; DG1416/WD622; DG1541/WD629; DG2965/WD428; DG2969/WD681; DG4952/WD599; DG7376/WD737; DG11814/WD574; DT153/WD463; DT332/WD2311; DT582/WD166; DT807/WD657; DT892/WD2230; DT986/WD737; DT1566/WD228; DT2117/WD353; DT2159/WD309; DT2160/WD443; DT2395/WD461; DT2714/WD2205; DT2804/WD84; DT2838/WD412; DT2936/WD599; DT3382/WD514; DT4133/WD456; DT4181/WD678; DT4199/WD255; DT4230/WD656; DT4266/WD501; DT4339/WD632; DT4497/WD378; DT4511/WD647; DT4550/WD658; DT4625/WD577; DT4637/WD471.

feet; the court ordered Defendants to ensure compliance within thirty days.[10]  For seven stores in violation by more than fifty square feet, the district court ordered Defendants to comply with the covenants.[11]  In addition, the district court directed three stores to comply with restrictive covenants that did not permit any sale of groceries.[12]  Finally, for one store, "gross inaccuracies" in the investigator report prevented Winn-Dixie from having a clear right to injunctive relief, but the court ordered Dollar Tree to measure the sales area and ensure compliance at that location within thirty days.[13]

In total, then, of the ninety-seven stores, the court found no violation of the grocery exclusives at thirty-seven stores; ordered some injunctive relief based on a narrow interpretation of "groceries" and "sales area" at seventeen; and granted no relief for an array of other reasons as to forty-three.  The district court rejected Defendants' affirmative defenses.  After Winn-Dixie appealed, Big Lots and Dollar Tree filed separate cross-appeals.  On September 10, 2012, Dollar General,

---

[10] BL512/WD2210; BL530/WD654; BL555/WD307; BL558/WD160; DG8551/WD561; DG8665/WD579.

[11] BL550/WD609; BL553/WD236; BL1519/WD306; BL1628/WD348; BL1711/WD302; DG1453/WD662; DG2634/WD777.

[12] BL525/WD698; BL4258/WD254; DT723/WD254.

[13] DT4365/WD236.

Big Lots, and Dollar Tree certified to the district court that all stores identified as having been in violation by the order were in compliance with the injunction.

## II.

### A.

After we inquired of the parties about our jurisdiction, the district court entered a second amended final judgment. That order certified the judgment as final pursuant to Rule 54(b). See Nat'l Ass'n of Bds. of Pharmacy v. Bd. of Regents of the Univ. Sys. of Ga., 633 F.3d 1297, 1306 (11th Cir. 2011) ("[A] subsequent Rule 54(b) certification cures a premature notice of appeal from a non-final order dismissing claims or parties."). It also addressed concerns about whether diversity jurisdiction had been properly pled. See 28 U.S.C. § 1653 ("Defective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts."); Mallory & Evans Contractors & Eng'rs, LLC v. Tuskegee Univ., 663 F.3d 1304, 1305 (11th Cir. 2011) (per curiam). Therefore, appellate and subject matter jurisdiction are proper. See 28 U.S.C. § 1291; id. § 1332.

### B.

Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938), commands that we apply the substantive law of Florida, the forum state, in this diversity action filed in the Southern District of Florida. See Nebula Glass Int'l, Inc. v. Reichold, Inc., 454 F.3d 1203, 1212 (11th Cir. 2006). Thus, for the stores located in Florida, we

15

interpret and enforce the restrictive covenants according to Florida law.  As for the stores outside of Florida, we look to Florida's choice of law rules.  See Mazzoni Farms, Inc. v. E.I. Dupont De Nemours & Co., 166 F.3d 1162, 1164 (11th Cir. 1999) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941)).  In interpreting Florida law, we look first for case precedent from the Florida Supreme Court.  Where we find none, we are "bound to adhere to decisions of the state's intermediate appellate courts absent some persuasive indication that the state's highest court would decide the issue otherwise." Provau v. State Farm Mut. Auto. Ins. Co., 772 F.2d 817, 820 (11th Cir. 1985) (per curiam).

Winn-Dixie argues that the district court erred by awarding little or no injunctive relief at fifty-four stores where the grocery exclusives were binding and enforceable as restrictive covenants.  At thirty-seven of these stores, the court found no violation, and thus refused to issue injunctions.  Where it did order injunctive relief, at seventeen other stores, it did so on a limited basis, requiring only that Defendants ensure that their sale of food items did not exceed an allowable shelving area.  Winn-Dixie claims that this relief was insufficient because the district court erred in interpreting the terms "staple or fancy groceries" and "sales area."  Despite the district court's careful analysis of this difficult matter, we are compelled to reverse as to these fifty-four stores because the court

16

interpreted the essential terms in the grocery exclusives based on a mistaken application of state law.

Florida law applies to forty-one of these stores located in Florida,[14] where the district court either found no covenant violation (twenty-five stores) or entered injunctive relief limited to the narrowly construed grocery exclusive terms (sixteen).  Winn-Dixie says that we are bound by a Florida appellate case that construed a materially identical Winn-Dixie grocery exclusive much more broadly than the district court did here.  See 99 Cent, 811 So. 2d at 722.  Because we agree as a matter of Florida law, and we are bound by Florida law, we reverse and remand as to these forty-one stores for a new trial based on an interpretation of the grocery exclusives terms consistent with the holding of the Florida Third District Court of Appeals in 99 Cent.

We review de novo the district court's interpretation of the language of the restrictive covenant.  See Gibbs v. Air Canada, 810 F.2d 1529, 1532 (11th Cir. 1987) ("Contract interpretation is generally a question of law subject to de novo

---

[14] BL505/WD506; BL512/WD2210; BL525/WD698; BL530/WD654; BL550/WD609; BL555/WD307; BL558/WD160; BL553/WD236; BL1519/WD306; BL1628/WD348; BL1711/WD302; BL4258/WD254; DG1056/WD489; DG1416/WD622; DG1453/WD662; DG1541/WD629; DG2634/WD777; DG2969/WD681; DG7376/WD737; DG 8551/WD561; DT332/WD2311; DT723/WD254; DT807/WD657; DT892/WD2230; DT986/WD737; DT1566/WD228; DT2117/WD353; DT2159/WD309; DT2714/WD2205; DT2804/WD84; DT2838/WD412; DT4181/WD678; DT4199/WD255; DT4230/WD656; DT4266/WD501; DT4339/WD632; DT4365/WD236; DT4497/WD378; DT4511/WD647; DT4550/WD658; DT4625/WD577.

17

review on appeal."). However, if the language "is ambiguous and the district court must look to extrinsic evidence to determine the intent of the parties, the district court's determination of such intent is a finding of fact and is reviewed using the clearly erroneous standard." United Benefit Life Ins. Co. v. U.S. Life Ins. Co., 36 F.3d 1063, 1065 (11th Cir. 1994).

The district court narrowly construed the covenant terms, confining "staple and fancy groceries" to food items and measuring "sales area" based only on shelving space. The court did so based on a long-standing general principle of Florida law: ambiguous restrictive covenants necessarily receive a narrow construction. The Florida Supreme Court has explained:

> Covenants restraining the free use of real property, although not favored, will nevertheless be enforced by courts of equity where the intention of the parties is clear in their creation, and the restrictions and limitations are confined to a lawful purpose and within reasonable bounds, unless the rights created by such covenants have been relinquished or otherwise lost. Such covenants are strictly construed in favor of the free and unrestricted use of real property, but effect will be given to the manifest intention of the parties as shown by the language of the entire instrument in which the covenant appears, when considered in connection with the circumstances surrounding the transaction. Due regard must be had for the purpose contemplated by the parties to the covenant, and words used must be given their ordinary, obvious meaning as commonly understood at the time the instrument containing the covenants was executed, unless they have acquired a peculiar meaning in the particular relation in which they appear, or in respect to the particular subject-matter involved, or unless it clearly appears from the context that the parties intended to use them in a different sense.

18

Moore v. Stevens, 106 So. 901, 903 (Fla. 1925) (emphasis added).  Florida law calls for a two-stage analysis.  Courts first ask whether a restrictive covenant is ambiguous.  And second, if it is, "substantial ambiguity or doubt must be resolved against the person claiming the right to enforce the covenant."  Id. at 904.

First, then, we are required to determine whether the grocery exclusives are indeed ambiguous.  In Florida, ambiguity exists when a restrictive covenant "is susceptible to two different interpretations, each one of which is reasonably inferred from [its] terms."  Commercial Capital Res., LLC v. Giovannetti, 955 So. 2d 1151, 1153 (Fla. 3d DCA 2007); see also Cont'l Ins. Co. v. Roberts, 410 F.3d 1331, 1333 (11th Cir. 2005) (noting that a term is ambiguous under Florida law "if it is subject to two reasonable interpretations").  "In reviewing a document, a court must consider the document as a whole, rather than attempting to isolate certain portions of it.  A court must look first to the plain language of a document and consider parol evidence only when the document is ambiguous on its face."  Lambert v. Berkley S. Condo. Ass'n, Inc., 680 So. 2d 588, 590 (Fla. 4th DCA 1996) (citations omitted); see Rose v. M/V "Gulf Stream Falcon", 186 F.3d 1345, 1350 (11th Cir. 1999) ("Contract interpretation principles under Florida law require us to look first at the words used on the face of the contract to determine whether that contract is ambiguous.").

19

If we were to assess the covenant terms using only this general analysis, both terms might appear ambiguous: "staple or fancy groceries" and "sales area" could be read as "susceptible to more than one reasonable interpretation." Auto-Owners Ins. Co. v. Anderson, 756 So. 2d 29, 34 (Fla. 2000). Neither of the terms is defined in the document. Referencing the historical evolution of the supermarket, Winn-Dixie argues that "staple or fancy groceries" includes both food and nonfood items. Originally, the general store sold a variety of household items, food and nonfood. The supermarket incorporated the sale of perishables like meat, dairy, and produce alongside the traditional grocer's wares. Winn-Dixie also cites to the Consumer Expenditure Study, an annual industry report of supermarket sales offered in evidence at trial that lists "Grocery-Non Food" as a category containing products like detergents, household supplies, and paper products. On the other hand, the Defendants have offered a reasonable food-only interpretation by pointing to the all-food examples listed immediately after "staple or fancy groceries": "meats, fish, vegetables, fruits, bakery goods, dairy products or frozen foods." Thus, groceries might mean only foods because "a word is known by the company it keeps (the doctrine of noscitur a sociis)." Gustafson v. Alloyd Co., 513 U.S. 561, 575 (1995); see, e.g., Beecham v. United States, 511 U.S. 368, 371 (1994) ("That several items in a list share an attribute counsels in

20

favor of interpreting the other items as possessing that attribute as well."). Thus the term "groceries" appears to admit at least two reasonable interpretations.

At first blush, the same could be said of the term "sales area." Winn-Dixie argues that "sales area" must include the aisle space in which shoppers stand when accessing shelves. "Shoppers do not arrive by chopper, sending ropes down to hoist up their purchases." 99 Cent, 811 So. 2d at 722. But Defendants counter that "sales area" applies only to the physical space occupied by shelves displaying restricted products. A Dollar General official "testified that there are many ways to measure 'sales area,' including linear feet of the fixture shelves, linear feet of the fixture footprint, cubic feet, square feet of the fixture footprint, and square feet of the fixture footprint plus one-half of the adjacent aisle space." Different readings of the grocery exclusive appear plausible.

Still, we cannot assess ambiguity in this case without accounting for what a Florida intermediate appellate court has said before about these very terms. In a 2002 decision, Winn-Dixie Stores, Inc. v. 99 Cent Stuff-Trail Plaza, LLC, 811 So. 2d 719, Florida's Third District Court of Appeals interpreted a standard grocery exclusive materially identical to many of those at issue in this case.[15] In that case,

_____

[15] The grocery exclusive in the Winn-Dixie lease in 99 Cent provided, in relevant part:

Landlord further covenants and agrees not to permit or suffer any property located within the shopping center to be used for or occupied by any business dealing in or which shall keep in stock or sell for off-premises consumption any staple or

21

like here, the trial court based injunctive relief on a definition of the terms limited

to <u>only</u> food items and shelving area, "the combined square footage of the store's

display racks, containing the items at issue." <u>Id.</u> at 721. The Florida appellate

court reversed, finding that a shopping center tenant was "bound by the clear

words" of a Winn-Dixie restrictive covenant. <u>Id.</u> at 722. The court stated that,

when a document does not define its terms, "to find the plain and ordinary meaning

of words, one looks to the dictionary." <u>Id.</u> Referring to Webster's Third New

International Dictionary (1986), the court interpreted "groceries" to include

<u>nonfood</u> items like "many household supplies (as soap, matches, paper napkins)."[16]

<u>Id.</u> Further, the court determined that "[l]imiting the amount of sales area to just

the 'footprint' of the actual fixtures is not a reasonable construction of the clause at

issue" because "[s]hoppers make their choices while standing in aisles and the 500

square feet provided for in the leases at issue obviously contemplated customers

---

> fancy groceries, meats, fish, vegetables, fruits, bakery goods, dairy products or
> frozen foods without written permission of the Tenant; except the sale of such
> items is not to exceed the lesser of 500 square feet of sales area or 10% of the
> square foot area of any storeroom within the shopping center, as an incidental
> only to the conduct of another business.

99 Cent, 811 So. 2d at 720 (emphasis omitted).

[16] In full, Webster's Third New International Dictionary defines "groceries" as "articles of food and other goods sold by a grocer." <u>Webster's Third New International Dictionary</u> 1001 (2002). A "grocer" is "a dealer in staple foodstuffs (as coffee, sugar, flour) and usually meats and other foods (as fruits, vegetables, dairy products) and many household supplies (as soap, matches, paper napkins)." <u>Id.</u>

viewing and purchasing products from such aisles." Id.  Therefore, for a grocery exclusive that contained a materially identical restriction on the sale of "staple or fancy groceries" to those found in ninety-one of the ninety-seven stores at issue in this case, the Florida court remanded for a more extensive injunction that counted nonfood grocery items and sales area including aisles.  Id.

The district court avoided applying 99 Cent, nevertheless, by distinguishing its factual and legal context, even though it recognized that "the standard grocery exclusive considered in 99 Cent is identical to the standard grocery exclusives in these consolidated cases."   "[W]hether a decision is binding on another is dependent upon there being similar facts and legal issues. . . . [W]here the . . . underlying facts are different, then a previous decision should not be binding." U.S. Fire Ins. Co. v. J.S.U.B., Inc., 979 So. 2d 871, 882-83 (Fla. 2007).  The district court distinguished 99 Cent, which involved one lease signed in 1999, from the current case, which involved many stores and leases that had been signed in the 1950s, 1960s, 1970s, 1980s, and 1990s, a fact deemed significant "in light of the changing definition of 'groceries' over the past sixty years."  The trial court concluded that "[i]t would be untenable . . . to apply 99 Cent's definition of 'groceries' in 2002 to leases that were signed as much as forty-five years earlier in five different states" because "what 99 Cent considered to be 'groceries' in 2002 is

23

likely more expansive than what . . . the parties to the leases at issue . . . considered to be groceries in previous years."

We do not find it so easy to distinguish 99 Cent from the present case. A Florida court considering the meaning of the same terms in a materially identical grocery exclusive sided with Winn-Dixie, finding these terms to be clear and unambiguous based on a dictionary definition. Thus, the 99 Cent court applied an alternate Florida rule of contract construction: "One looks to the dictionary for the plain and ordinary meaning of words." Beans v. Chohonis, 740 So. 2d 65, 67 (Fla. 3d DCA 1999); see Garcia v. Fed. Ins. Co., 969 So. 2d 288, 291-92 (Fla. 2007) (assessing ambiguity in an insurance contract by consulting a dictionary as a "reference[] commonly relied upon to supply the accepted meanings of words"); Citizens Prop. Ins. Corp. v. M.A. & F.H. Props., Ltd., 948 So.2d 1017, 1020 (Fla. 3d DCA 2007) (citing 99 Cent for the principle that, "[i]n the absence of a contractual definition, we must presume that [a] word was intended to be used in its plain and ordinary way as can be ascertained by reference to a dictionary"). The fact that a similar form contract was signed many times over five decades in the current case, but was signed only once in 99 Cent, does little to undermine the Florida court's conclusions about the plain meaning of the same covenant terms. The appellate court in no way based its conclusions on the development of the

24

terms over time.  Nor, significantly do we see any material evolution of the dictionary definition of groceries over the period when the leases were signed.

The Florida court in 99 Cent referenced Webster's Third New International Dictionary, which was first published in 1961.  Its definitions of "groceries" and "grocer" have remained unchanged since.  Notably, just one lease in this case was signed before publication of Webster's Third New International.[17]  And that lease, from 1958, included a nonstandard exclusive (with no mention of "staple or fancy groceries") that the district court found unenforceable anyway on other grounds. Regardless, Webster's Second New International Dictionary, published first in 1934, also defined groceries to allow non-food items: a grocer is "a dealer in tea, sugar, spices, coffee, fruits, and various other commodities, chiefly foodstuffs." Webster's Second New International Dictionary 1105 (1958) (emphasis added). Indeed, a review of other dictionaries reveals no evidence of a contrary or changing definition.  See, e.g., Oxford English Dictionary 862 (2d ed. 1991) (groceries are "goods sold by a grocer;" a grocer is "[a] trader who deals in spices, dried fruits, sugar, and, in general, all articles of domestic consumption except those that are considered the distinctive wares of some other class of tradesmen" (emphasis added)); Webster's New Collegiate Dictionary 502 (1979) ("groceries" are "commodities sold by a grocer"; a "grocer" is "a dealer in staple foodstuffs,

_____

[17] BL554/WD671.

25

household supplies, and usu. meats, produce, and dairy products" (emphasis

added)).

The district court also supported its interpretation of these terms by pointing

to language in approximately twenty of the leases that referred to "groceries" as

"food items." More specifically, the standard grocery exclusives in these leases

included additional carve outs for some drug stores, providing, for example, that

"the permitted sale of the above listed food items shall be expanded to 1,500 sq. ft.

of sales area." The Defendants contend that, because the carve out refers to

"groceries" as among "the above listed food items," only food sales are restricted.

This argument fails too because the very same type of carve out, including the

same reference to "above listed food items," was present in the lease at issue in 99

Cent. In short, a Florida appellate court looking at identical language did not read

"above listed food items" to restrict "groceries" to only food. This interpretation is

consistent with the text: it is possible that the added carve-outs were meant only to

restrict food grocery sales, whereas the original language retained broader

meaning. Because the Florida court confronted the same added language, no such

distinction can be wedged between this case and 99 Cent on that basis.

Federal courts sitting in diversity are "bound to adhere to decisions of

[Florida's] intermediate appellate courts, absent some persuasive indication that

the state's highest court would decide the issue otherwise." Studstill v. Borg

Warner Leasing, 806 F.2d 1005, 1007 (11th Cir. 1986) (per curiam) (alteration in original) (quoting Provau, 772 F.2d at 820).  We see no persuasive indication that the Florida Supreme Court would interpret the grocery exclusives in this case differently than the state appellate court did for the materially identical language found in 99 Cent.  Indeed, the only other state intermediate appellate court to confront the interpretation of the Winn-Dixie grocery exclusives reached the same result in a nonprecedential order affirming without opinion when a trial court followed 99 Cent.  See Winn-Dixie Stores, Inc. v. Noble Management Co. & Dolgencorp, Inc., No. CI 05-CI-1874, (Fla. 9th Jud. Cir. Aug. 31, 2007), aff'd sub nom. Dolgencorp, Inc. v. Winn-Dixie Stores, Inc., 988 So. 2d 1287 (Fla. 5th DCA 2008) (per curiam without opinion).

We are Erie-bound to give effect to the state rules of decision on the meaning and application of restrictive covenants.  Thus, we conclude that the district court erred in finding the terms ambiguous and proceeding to the second step to construe the terms narrowly.  Instead, the court should have followed the holding in 99 Cent by looking to the dictionary definitions, which instruct that "groceries" includes food and "many household supplies (as soap, matches, paper napkins)" and that sales area "includes fixtures and their proportionate aisle

27

space." 811 So. 2d at 722 (emphasis added).[18] Because the district court erred in discerning and applying Florida's law, for these forty-one Florida stores, we reverse the judgment of the district court and remand the case for a new trial based on the definition of the terms "staple or fancy groceries" and "sales area" under Florida law as pronounced by Florida's Third District Court of Appeals in 99 Cent.[19]

### C.

Of course, the Florida court's analysis in 99 Cent is binding only as a pronouncement of Florida law. But the district court applied Florida law to the interpretation of grocery exclusive terms found in all the leases at issue, including for eleven stores in Alabama[20] and two in Georgia.[21] In this diversity case we must

---

[18] As the Florida court did in 99 Cent, we note that "it may not be easy to pinpoint each item to be considered groceries." Id. However, we have faith in the district court's ability to apply both the specific holding and the general analytical framework drawn in that case.

[19] This same analysis disposes of one of the issues on cross-appeal, at least as to the stores in Florida. Big Lots argues that the district court erred in defining beverages as "groceries" because they are not "food" items. But Big Lots' basis for this argument drops out when 99 Cent is applied, because that case does not limit groceries to food. Moreover, Webster's Third New International Dictionary lists among the products sold by a grocer "dairy products," presumably including milk, a beverage. Webster's Third New International Dictionary 1001 (2002). It also lists coffee, which, even if dry, suggests grocers sell some beverage products. Id. The district court did not err in counting beverages as groceries under Florida law.

[20] DG246/WD478; DG2965/WD428; DG4952/WD599; DG8665/WD579; DG11814/WD574; DT153/WD463; DT2395/WD461; DT2936/WD599; DT3382/WD514; DT4133/WD456; DT4637/WD471. The district court found no covenant violation and thus issued no relief at any of these stores, except for DG8665/WD579, which was in violation by less than fifty square feet and was ordered to comply.

28

follow the choice of law rules of the forum state, Florida.  See Mazzoni Farms, 166 F.3d at 1164.  A Florida court adjudging a restriction on property in another state applies the substantive law of the home state (lex loci rei sitae).  See Xanadu of Cocoa Beach, Inc. v. Zetley, 822 F.2d 982, 985 (11th Cir. 1987); Connor v. Elliott, 85 So. 164, 165 (Fla. 1920) ("So far as real estate or immovable property is concerned, the laws of the state where it is situated furnish the rules which govern its descent, alienation, and transfer, the construction, validity, and effect of conveyances thereof, and the capacity of the parties to such contracts or conveyances, as well as their rights under the same.").  Therefore, Florida law requires that the laws of Alabama and Georgia be applied to interpret restrictive covenants running with property located in those states unless the parties validly consented to the application of Florida law.  The record in no way indicates such consent.  Therefore, we reverse and remand the judgment of the district court concerning the eleven Alabama stores and the two found in Georgia and direct the court to apply the appropriate state law rules of decision for those locations.[22]

### III.

---

[21] DT582/WD166; DT2160/WD443.  At both stores, the court found no violation and ordered no relief.

[22] On appeal, none of the parties specifically argued for the application of Alabama and Georgia law to the restrictive covenants binding stores in those states.  However, we do not deem this issue waived, since Winn-Dixie broadly challenged the district court as having failed "to follow controlling state law governing the enforcement and plain meaning of Winn-Dixie's grocery exclusives."

29

For the remaining forty-three stores, the district court denied all relief on other grounds, regardless of whether the stores violated Winn-Dixie's grocery exclusives.  Discerning no error as to these stores, we affirm.

A.

After barring testimony from Winn-Dixie's expert on damages, Dr. Pacey, the district court refused to award compensatory damages for any store at issue. Winn-Dixie argues that the court erred in excluding Dr. Pacey, but we disagree. The district court acted within its considerable discretion when it concluded that Dr. Pacey's testimony would not assist the trier of fact and that her methodology was not sufficiently reliable.

We review for abuse of discretion a trial court's decision to exclude an expert's testimony.  Kilpatrick v. Breg, Inc., 613 F.3d 1329, 1334 (11th Cir. 2010); see also Gen. Elec. Co. v. Joiner, 522 U.S. 136, 140 (1997).  Exclusion of an expert amounts to an abuse of discretion if the court "applies the wrong law, follows the wrong procedure, bases its decision on clearly erroneous facts, or commits a clear error in judgment."  United States v. Brown, 415 F.3d 1257, 1266 (11th Cir. 2005). The district court enjoys "considerable leeway" in making such evidentiary decisions, and will be reversed only if "the ruling is manifestly erroneous."  United States v. Frazier, 387 F.3d 1244, 1258 (11th Cir. 2004) (en banc).

Under Rule 702 of the Federal Rules of Civil Procedure, interpreted in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 593 (1993), the district courts perform an essential "gatekeeping" function in screening expert scientific and technical evidence. Frazier, 387 F.3d at 1260. To this end, trial courts conduct a rigorous three-part inquiry that asks: (1) if the expert is qualified by background, training, and expertise to testify competently regarding the matters he intends to address; (2) whether the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) if the expert testimony would assist the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. Id.

Here, the district court barred Dr. Pacey's testimony based on the second and third prongs: her reports "would not assist the trier of fact in determining a fact in issue in this case" and "her methodology [wa]s not sufficiently reliable." To begin with, the court criticized Dr. Pacey's analysis because it measured merely the effect of the presence of a competing store, without reflecting that most of the Defendants' stores were permitted to sell some grocery products. The district court found that, "[b]y measuring overall competition and consumer behavior instead of Winn-Dixie's damages caused by Defendants' violations of the grocery exclusives, . . . Dr. Pacey's Reports are analyzing the wrong problem and therefore do not

31

assist the trier of fact to determine a fact in issue in this case." The district court also determined that, because Dr. Pacey's economic model and regression analysis did not provide empirical evidence of causation, "the probative value of her evidence is substantially outweighed by the danger of misleading the jury under Fed. R. Evid. 403." The court expressed a number of other concerns with the expert's reports: they were not peer reviewed; they used Winn-Dixie sales data drawn from recession years in 2009 and 2010 to calculate damages during the pre-recession period from 2005 through 2008, when Winn-Dixie sales likely were higher; they presumed without sufficient support that customers purchased meat and other groceries at the same store; they considered only competitors within an arbitrary three mile radius of a Winn-Dixie store; and they alleged damages suffered by Winn-Dixie for products that Defendants' stores do not sell.

The district court acted within its broad discretion in determining that Dr. Pacey's reports could not satisfy the second and third Daubert prongs. In this case, these two considerations are connected. Dr. Pacey's testimony was not based upon a methodology that could reliably estimate Winn-Dixie damages caused by Defendants' covenant violations. As a result, her testimony would not assist the trier of fact in determining a fact at issue.

First, the trial court could fairly determine that the regression analysis employed by Dr. Pacey was not a reliable method of showing damages suffered by

32

Winn-Dixie as a result of grocery exclusive violations. Dr. Pacey's model failed to recognize that nearly all of the restrictive covenants permitted some amount of grocery sales at Defendants' stores. Winn-Dixie acknowledges this shortcoming, but argues that a finder of fact could calculate damages merely by applying a "credit" for "permitted" sales. The district court rejected this approach, however, because the analysis measured "overall competition and consumer behavior instead of Winn-Dixie's damages caused by Defendants' violations of the grocery exclusives." Dr. Pacey measured for the effect of the wrong factor -- a dollar store's proximity, not its prohibited grocery sales. The district court could determine, as it did, that "no tweaking can fix that problem." Winn-Dixie also argues that Dr. Pacey believed that sales of grocery products up to a maximum of 500 square feet of sales area have zero or negligible impact. But the district court reasonably rejected the unsupported assumption that, because Winn-Dixie permits some sales, those permitted sales must have no effect on supermarket revenue. In the end, Dr. Pacey's regression model was not a reliable method for establishing the damages caused by Defendants' violations of restrictive covenants. Dr. Pacey herself admitted to the district court, when asked why her regression analysis did not measure "the effect of the violation" instead of the more general presence of a competitor: "if you want to measure it that way, it's not a regression measure. Then don't use regression. Use some other avenue."

33

Second, because Dr. Pacey's methodology did not reliably measure Winn-Dixie's damages, and instead estimated the effect of a Defendant store's <u>presence</u> on Winn-Dixie sales, the trial court could determine that her testimony would not have helped the trier of fact. In <u>Daubert</u>, the Supreme Court explained:

> Rule 702 further requires that the evidence or testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." This condition goes primarily to relevance. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." 3 Weinstein & Berger ¶ 702[02], p. 702-18. The consideration has been aptly described by Judge Becker as one of "fit." "Fit" is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes. The study of the phases of the moon, for example, may provide valid scientific "knowledge" about whether a certain night was dark, and if darkness is a fact in issue, the knowledge will assist the trier of fact. However (absent creditable grounds supporting such a link), evidence that the moon was full on a certain night will not assist the trier of fact in determining whether an individual was unusually likely to have behaved irrationally on that night. Rule 702's "helpfulness" standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.

509 U.S. at 591-92 (citations omitted).

Here, the trial court could reasonably determine that "fit" is lacking. Dr. Pacey studied the correlation between Winn-Dixie non-meat grocery sales and the presence of a Defendant's store nearby. But, to prove its claims, Winn-Dixie needed to make a far more precise showing: that Winn-Dixie suffered damages as a result of Defendants' sale of groceries in a larger sales area than permitted by the restrictive covenants. Dr. Pacey's analysis employed tools far too blunt to

34

illuminate this question.  Winn-Dixie asks to bridge too broad a logical gap: the fact that Dr. Pacey found lower Winn-Dixie sales when a dollar store is nearby sheds little light on the amount of direct damages caused by a Defendant's impermissible grocery sales.  But admission of the evidence could mislead a jury into believing that the data speaks to a causal link.  See Frazier, 387 F.3d at 1263 ("[E]xpert testimony may be assigned talismanic significance in the eyes of lay jurors, and, therefore, the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse.").  As the district court explained:

> [T]he issue in this case is not whether Defendants are competing with Winn-Dixie. The issue is what damages, if any, Defendants caused Plaintiffs by selling more groceries than allowed in the respective stores' grocery exclusives.  Since Dr. Pacey's Reports do not provide any empirical evidence on this issue, I find that allowing her to testify may cause a jury to believe that Defendants are causing Plaintiffs' damages by selling more groceries than allowed, when her regression model and other empirical data is only focused on competition.

Thus, the district court acted within its discretion in excluding Dr. Pacey's testimony when it found her conclusions about damages were not based on reliable methodology and her analysis did not assist the trier of fact (here, the district court) with any issue in the case.  See Goodman v. Highlands Ins. Co., 607 F.2d 665, 668 (5th Cir. 1979) ("[A] trial judge sitting without a jury is entitled to even greater

35

latitude concerning the admission or exclusion of evidence.");[23] see also In re Unisys Sav. Plan Litig., 173 F.3d 145, 158 (3d Cir. 1999).  While the court expressed a number of additional concerns with Dr. Pacey's analysis, particularly with the variables underlying her regression calculations, we need not address them to affirm the court's exclusion of her testimony.

B.

Winn-Dixie's unsuccessful Daubert argument is the only challenge it makes to the court's conclusion that Winn-Dixie could not prove damages.  See Winn-Dixie, 886 F. Supp. 2d at 1346 (explaining that, after Dr. Pacey was excluded, evidence as to damages "was hopelessly speculative," and "Winn-Dixie effectively conceded that it could not prove damages").  Thus, we see no error in the district court's determination that Winn-Dixie cannot prove compensatory damages.  With damages off the table, then, we affirm the denial of all relief as to thirty-one stores that had closed by the time of trial, necessarily making injunctions ineffective.[24] For the same reason, we affirm as to four stores for which Winn-Dixie does not

---

[23] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.
[24] BL570/WD612; DG1095/WD209; DG1322/WD612; DG1333/WD151; DG1382/WD30; DG1389/DG710; DG1402/WD2260; DG1413/WD631; DG1421/WD144; DG1451/WD723; DG1456/WD331; DG1493/WD647; DG1513/WD2326; DG1522/WD2268; DG1524/WD566; DG1649/WD2342; DG2363/WD411; DG2762/WD652; DG3013/WD713; DG4008/WD553; DG4444/WD2213; DG4701/WD649; DG4821/WD3; DG4981/WD221; DG7457/WD167; DG7539/WD577; DG7584/WD639; DG7883/WD305; DG9149/WD750; DG10484/WD654; DT1135/WD116.

36

challenge the district court's determination that injunctive relief was unavailable because of Rule 65(d).[25]

## C.

We also affirm the district court's refusal to enforce the grocery exclusives at six stores in Louisiana[26] and one store Mississippi[27] pursuant to the laws of those states. We review the district court's interpretation of state law in a diversity case de novo. Jones v. United Space Alliance, L.L.C., 494 F.3d 1306, 1309 (11th Cir. 2007).

### 1.

The district court refused to enforce the restrictive covenants under Louisiana law, concluding that state law required more than "a clearly expressed intention" that a covenant run with the land. We agree. In Louisiana, "[m]erely stating that a contract is to 'run with the land' does not create immoveable rights." U-Serve Petroleum & Invs., Inc. v. Cambre, 486 So. 2d 821, 824 (La. Ct. App. 1986). Instead, for a covenant to run with the land -- to be a "real obligation" -- it "can be established only by a title. . . . [T]he real obligation must be clearly apparent from the title documents themselves." Leonard v. Lavigne, 162 So. 2d

---

[25] BL554/WD671; DG7268/WD123; DG9263/WD705; DT1805/WD705.

[26] DG626/WD1537; DG770/WD1540; DG2685/WD1572; DG7824/WD1588; DG10357/WD1431; DT2161/WD1555.

[27] DG1026/WD1511.

341, 343 (La. 1964).  The district court refused to enforce Winn-Dixie's grocery exclusives at the six Louisiana locations at issue because the grocery exclusives were not a "real obligation" clearly apparent from the "title documents."

Winn-Dixie's effort to squeeze a common law rule into the civil law fails because, in Louisiana, a lease contract is not a title document that can give rise to a real obligation.  See Leonard, 162 So. 2d at 343. "Under the civil law concept, a lease does not convey any real right or title to the property leased, but only a personal right."  Richard v. Hall, 874 So. 2d 131, 145 (La. 2004).  Winn-Dixie thus cannot enforce its grocery exclusives under Louisiana law because the leases established only personal, not real property rights -- the leases containing the grocery exclusives are not title documents that can create a real obligation.  See Leonard, 162 So. 2d at 343 (refusing to find a covenant running with the land when a lease provision restricted operation of a competing filling station on adjoining property); Wolfe v. N. Shreveport Dev. Co., 228 So. 2d 148, 149-51 (La. Ct. App. 1969) (refusing to find a covenant running with the land when a lease provision prohibited the operation of other shoe stores in a shopping center); see also U-Serve, 486 So. 2d at 824 ("Although the contract in question stated that it was to 'run with the land,' it was in fact a personal contract between Cambre and U-Serve because it favored the person of U-Serve and not a dominant estate.").  In short, the

38

district court did not err in concluding that Louisiana law does not recognize Winn-Dixie's grocery exclusives as real obligations running with the land.

2.

Likewise, the district court declined to enforce a grocery exclusive against one Dollar General store at issue in Mississippi because of a lack of privity of estate. Again, we find no error. The Mississippi Supreme Court requires that "privity of estate must exist between the person claiming right to enforce the covenant and the person upon whom burden of covenant is to be imposed." Hearn v. Autumn Woods Office Park Prop. Owners Ass'n, 757 So. 2d 155, 158 (Miss. 1999); see Vulcan Materials Co. v. Miller, 691 So. 2d 908, 913 (Miss. 1997). In Mississippi, privity of estate exists between "those who stand in mutual or successive relationship to the same rights of property," Lipscomb v. Postell, 38 Miss. 476, 489 (1860). In other words, privity of estate is "that which exists between lessor and lessee, tenant for life and remainderman or reversioner, etc., and their respective assignees, and between joint tenants and coparceners." Hearn, 757 So. 2d at 158 (quoting Black's Law Dictionary 1080 (5th ed. 1979)).

Mississippi case precedent does little to elaborate on this privity requirement. Traditionally, however, privity of estate is satisfied when a party shows both horizontal and vertical privity. See 9 Powell on Real Property § 60.04(3)(c)(v) (Michael Allan Wolf ed., 2001 & Supp. 2013). Horizontal privity

39

requires that a covenant is created as part of a simultaneous conveyance of an estate between the parties.  20 Am. Jur. 2d Covenants, Conditions, and Restrictions § 26 (2014).  Here, such a relationship did exist.  The shopping center landlord shared a lessor-lessee relationship with tenant Winn-Dixie when the grocery exclusive was included in the lease agreement.

Vertical privity, by contrast, refers to the relationship between a covenanting party and her successor(s) in interest: here, between the landlord and Dollar General.  Id.  Vertical privity comes in two flavors, strict and relaxed:

> To establish vertical privity, a chain of title must be established between the original covenantor or covenantee and the person claimed to be bound by the covenant or entitled to its benefit.  For "strict" vertical privity, the successor must hold the same estate (in durational, not geographical, terms) as the original party to the servitude; for "relaxed" vertical privity, the successor may hold a lesser estate carved out of the estate held by the original party.  Lessees of the person holding the same estate as an original party to the covenant and life tenants of property in which the remainder or reversion is the same estate as that of an original party to the covenant are not in strict vertical privity, but meet the requirement for relaxed vertical privity.

Restatement (Third) of Prop.: Servitudes § 5.2 cmt. b. (2000).  In the present case, relaxed vertical privity exists, but strict vertical privity does not.  Because Dollar General took only part of the landlord's estate (a leasehold), and was not an assignee of its entire interest, there is no strict vertical privity.  However, because Dollar General took a part of the estate, relaxed privity is satisfied.  Thus, Winn-

40

Dixie cannot enforce its grocery exclusive for the Mississippi store if that state requires strict vertical privity.

Mississippi case law does not address the appropriate vertical privity standard.  The modern trend, exemplified in the Third Restatement of Property, is to eliminate the vertical privity requirement.  Instead of following this trend, Mississippi courts have retained a general privity rule in recent cases without specifying what type of vertical privity they require.  See, e.g., Journeay v. Berry, 953 So. 2d 1145, 1154 (Miss. Ct. App. 2007).  Therefore, to determine the vertical privity rule in Mississippi, we look to earlier authorities that reflect the traditional privity principles from which Mississippi drew its doctrine.  "The first Restatement of Property took the position that relaxed vertical privity is required for the benefit of covenants to run either at law or in equity, and that strict vertical privity is required for the burdens of covenants to run at law."  Restatement (Third) of Prop.: Servitudes § 5.2 cmt. b.  Indeed, the First Restatement of Property explained:

> The successors in title to land respecting the use of which the owner has made a promise are not bound as promisors upon the promise unless by their succession they hold
>
> > (a) the estate or interest held by the promisor at the time promise was made, or
> >
> > (b) an estate or interest corresponding in duration to the estate or interest held by the promisor at that time.

Restatement (First) of Prop. § 535 (1944). The Restatement authors commented:

41

> The restriction of liability to cases where this formal identification exists rests in modern times upon the feeling that the imposition of an obligation as a promisor, upon one who has not promised, by virtue of succession to another who has should be kept within relatively narrow even though formal limits.

Id. cmt. a.

Though courts and commentators do not universally agree about the wisdom of a strict vertical privity requirement, courts in a number of states have cited the First Restatement in requiring strict vertical privity for a burden to run.  See, e.g., Marathon Fin. Co. v. HHC Liquidation Corp., 483 S.E.2d 757, 765 (S.C. Ct. App. 1997); Grimes v. Walsh & Watts, Inc., 649 S.W.2d 724, 728 (Tex. App. 1983); Old Dominion Iron & Steel Corp. v. Va. Elec. & Power Co., 212 S.E.2d 715, 721 (Va. 1975).  We believe that, confronted with this question, Mississippi courts would follow this trend and require strict vertical privity to enforce the burden of a restrictive covenant.  As a result, because strict vertical privity does not exist between Dollar General and the shopping center landlord in this case, Winn-Dixie cannot enforce a restrictive covenant against the Mississippi store.

## D.

We also affirm the district court's conclusion that Winn-Dixie could not enforce a covenant against one Dollar General store in Florida whose lease was

42

signed before the Winn-Dixie lease that contained the restrictions.[28]  Winn-Dixie

argues that, under Florida law, subsequent modifications to the terms of Dollar

General's lease made the covenant enforceable.  Reviewing de novo this question

of state law, we find that the lease modifications here did not subject Dollar

General to covenants created after its original lease.

"Restrictive covenants are only enforceable against those who have notice

of such restrictions . . . ."  Hagan v. Sabal Palms, Inc., 186 So. 2d 302, 311 (Fla. 2d

DCA 1966) (quoting Batman v. Creighton, 101 So. 2d 587, 593 (Fla. 2d DCA

1966)).  Therefore, a party who takes an interest in property before a restriction is

created, and who thus lacks notice of that limitation, is not bound by a restrictive

covenant.  See Norwood Shopping Ctr., Inc. v. MKR Corp., 135 So. 2d 448, 450

(Fla. 3d DCA 1961).  One cannot know of what does not exist.  However, after

Winn-Dixie signed its lease, Dollar General agreed to lease modifications that

"extended the term, added some common area maintenance charges that were not

involved in the original lease, changed the property tax obligation, added some

options to renew under specific terms, and altered the original percentage rent

provisions."  Winn-Dixie argues that, because Dollar General executed these lease

modifications, it formed a new lease subject to Winn-Dixie's then-existing

property rights.

---

[28] DG1420/WD611.

43

No Florida precedent, and little national case law, addresses whether a lease modification can subject a tenant to a restrictive covenant formed after creation of the original leases.  A New York case cited by the district court provides the closest comparator.  See L'Art de Jewel Ltd. v. Hudson Sheraton Corp., 46 A.D.3d 418 (N.Y. App. Div. 2007).  There, the dispute involved two jewelers who leased space in a hotel.  The jeweler who signed the later lease sued the first based on a restrictive covenant, claiming that the first "was on notice of the terms of the restrictive covenant in plaintiff's lease when [the first jeweler] commenced a 'new' term of its license."  Id. at 420.  The New York appellate court rejected this argument:

> Th[e] agreement between [the first jeweler] and the hotel merely amended the existing May 1999 license by extending its term and relocating [the jeweler's] operation in a different part of the hotel's lobby.  As to all other particulars, the May 1999 agreement continued in effect, and governed the rights of the parties in regard to [the jeweler's] operation in the hotel lobby.

Id.  Because the original lease remained in effect, albeit subject to modified terms concerning the length of the lease and location of the operation, the first jeweler's original lease controlled for purposes of determining restrictive covenants.  As a result, later lease modifications did not bind a first tenant to a restrictive covenant created by a second tenant's lease.  Subsequent New York cases cite and apply the rule found in L'Art.  See Ernie Otto Corp. v. Inland Se. Thompson Monticello, LLC, 91 A.D.3d 1155, 1157 (N.Y. App. Div. 2012) (explaining that, for purposes

44

of enforcing restrictive covenants, "[m]ere amendments to a preexisting tenant's lease, that do not materially affect the rights of the parties under it or otherwise work to annul the prior agreement, do not constitute a new agreement"); Fratelli's Pizza & Rest. Corp. v. Kayzee Realty Corp., 74 A.D.3d 481, 481 (N.Y. App. Div. 2010) ("[T]he subject restrictive covenant cannot be enforced against a competing tenant whose lease predates the covenant's execution, absent evidence that the competing tenant's lease is falsely dated, or that the competing tenant, before entering into its lease, had notice of the landlord's intention to enter into the covenant . . . .").

A Florida court likely would apply the same rule, particularly because in Florida "[r]estrictive covenants are not favored and are to be strictly construed in favor of the free and unrestricted use of real property." Wilson v. Rex Quality Corp., 839 So. 2d 928, 930 (Fla. 2d DCA 2003) (citing Moore, 106 So. at 903); cf. Fratelli's Pizza, 74 A.D.3d at 482 ("[G]uided by the principles that restrictive covenants in leases, such as use clauses, are 'strictly construed against those seeking to enforce them' . . . we find that the language of the subject restrictive covenant is consistent with its prospective application, and that the parties did not intend the covenant to apply to tenants with preexisting leases." (citations omitted)). A lease modification that alters only such terms as the lease length and cost, and that otherwise demonstrates an intent to leave the remaining conditions of

45

the underlying lease unchanged, does not automatically bind the modifying tenant to restrictive covenants executed after the date of the original lease.

Nevertheless, Winn-Dixie cites to a number of cases drawn from other contexts in which Florida courts found that material alterations in lease modifications gave rise to new agreements.  One court held that a landlord's statutory lien was not entitled to priority when the "landlord and tenant terminated the original lease prior to any default of the tenant's lease obligations and entered into a new lease after creditors' security interest was perfected."  Robie v. Port Douglas (Fla.), Inc., 662 So. 2d 1389, 1390 (Fla. 4th DCA 1995); see Flowers v. Centrust Sav. Bank, 556 So. 2d 1123, 1125 (Fla. 3d DCA 1989) ("[W]hen the commencement of a tenancy, based upon a lease, creates a statutory landlord's lien . . . such lien is viable only as long as the underlying lease exists.").  Other courts have ruled that a real estate broker's entitlement to commissions "ends with the original lease term where an extension of that term involves new and different rights and responsibilities of the landlord and tenant so that in effect a 'new' lease has been negotiated."  Rauch v. Chama Invs., N.V., 641 So. 2d 501, 502 (Fla. 4th DCA 1994) (per curiam); see Strano v. Reisenger Real Estate, Inc., 534 So. 2d 1214, 1215 (Fla. 3d DCA 1988) (lease modification was not a "renewal" for purposes of a real estate broker's entitlement to a commission).  Finally, when a new arbitration statute was enacted between the signing of an original lease and a

46

modification, a court held that the statute applied because the modification amounted to a new agreement. See Bartke's, Inc. v. Hillsborough Cnty. Aviation Auth., 217 So. 2d 885, 887 (Fla. 2d DCA 1969).

These cases represent Florida law for cases that involve statutory lien priority, real estate broker commissions, and the applicability of arbitration statutes. But they say precious little about the enforcement of a restrictive covenant, a disfavored device that involves far different policy considerations. We decline to extrapolate from these dissimilar cases when Florida law disfavors restrictive covenants as restraining the free use of land. The district court did not err in determining that Florida law bars enforcement of the restrictive covenant against the Dollar General store, whose lease was signed before Winn-Dixie's, merely because Dollar General entered into later modifications of time and price terms.

## E.

Winn-Dixie raises a number of other issues that lack merit, and thus do not alter the outcome at any stores.

### 1.

Winn-Dixie argues that the district court should have awarded punitive damages pursuant to Florida law. After a bench trial, we review a district court's decision to award or deny punitive damages for abuse of discretion. See Claiborne

47

v. Ill. Cent. R.R., 583 F.2d 143, 154 (5th Cir. 1978) ("Having determined that a punitive damages award under section 1981 is permissible, we also find no abuse of discretion in the grant of such an award in this case.").

Florida law allows punitive damages only "if the trier of fact, based on clear and convincing evidence, finds that the defendant was personally guilty of intentional misconduct or gross negligence." Fla. Stat. § 768.72(2). "'Intentional misconduct' means that the defendant had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage." Id. § 768.72(2)(a). "'Gross negligence' means that the defendant's conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct." Id. § 768.72(2)(b).

The district court denied punitive damages because "[t]he grocery exclusives sought to be enforced against the Defendants are rife with ambiguities and the scope of their restrictions are uncertain at best," and, "[m]oreover, Plaintiffs did not make a formal demand on Defendants to comply with their grocery exclusives prior to filing this lawsuit." The district court did not abuse its discretion in determining that Winn-Dixie failed to prove, by clear and convincing evidence, that the Defendants committed the requisite intentional misconduct or gross

48

negligence.  The proper construction of the grocery exclusives presents a difficult question of Florida law upon which reasonable observers surely can differ.  Winn-Dixie provided no evidence indicating actual intent, nor that Defendants acted in a grossly negligent manner.  Instead, the evidence presented indicated that Defendants conducted themselves in accordance with a reasonable interpretation of the grocery exclusives.  The district court did not err in denying punitive damages when it found Winn-Dixie failed to meet its burden under Florida law.  Cf. Mee Indus. v. Dow Chem. Co., 608 F.3d 1202, 1221 (11th Cir. 2010) ("Although sufficient evidence was presented to place the issues of probable cause and advice of counsel before the jury, the closeness of those issues confirms that the evidence is insufficient to allow a reasonable juror to find by the clear and convincing standard that Dow could be liable for punitive damages.").

## 2.

Winn-Dixie also argues that collateral estoppel precluded Dollar General from relitigating the enforcement, scope, and meaning of the grocery exclusives in force at any of its stores at issue.  Winn-Dixie claims that the district court should have given preclusive effect to a Florida decision in which Winn-Dixie obtained a final judgment granting injunctive relief for a single Dollar General store not at issue in this case.  See Noble, No. CI 05-CI-1874 (Fla. 9th Jud. Cir. Aug. 31, 2007).  The district court refused to apply collateral estoppel because "the issues in

49

these cases are not identical to <u>Noble</u> and thus issue preclusion cannot be granted." We review <u>de novo</u> whether Florida law allowed the district court to give preclusive effect to the state court judgment. <u>Aldana v. Del Monte Fresh Produce N.A.</u>, 578 F.3d 1283, 1288 (11th Cir. 2009) ("The question whether to give preclusive effect to a state court's judgment is a question of law, and thus also is reviewed de novo.").

"Under the Full Faith and Credit Act, 28 U.S.C. § 1738, a federal court must 'give preclusive effect to a state court judgment to the same extent as would courts of the state in which the judgment was entered.'" <u>Brown v. R.J. Reynolds Tobacco Co.</u>, 611 F.3d 1324, 1331 (11th Cir. 2010) (quoting <u>Kahn v. Smith Barney Shearson Inc.</u>, 115 F.3d 930, 933 (11th Cir. 1997)).  Therefore, we give preclusive effect to a state court judgment if: "(1) the courts of the state from which the judgment emerged would do so themselves; and (2) the litigants had a full and fair opportunity to litigate their claims and the prior state proceedings otherwise satisfied the applicable requirements of due process." <u>Quinn v. Monroe Cnty.</u>, 330 F.3d 1320, 1329 (11th Cir. 2003).  In Florida, "collateral estoppel applies if (1) an identical issue, (2) has been fully litigated, (3) by the same parties or their privies, and (4) a final decision has been rendered by a court of competent jurisdiction." <u>Id.</u>; <u>see</u> <u>Essenson v. Polo Club Assocs.</u>, 688 So. 2d 981, 983 (Fla. 2d DCA 1997).

50

Here, the result turns on the appropriate Florida rule for assessing whether issues are identical.  Florida case law does not discuss in any great detail the standard for measuring the identity of issues.  However, the authors of the Second Restatement of Judgments, which Florida courts have cited in otherwise applying collateral estoppel, see, e.g., Cook v. State, 921 So. 2d 631, 634 (Fla. 2d DCA 2005), commented:

> When there is a lack of total identity between the particular matter presented in the second action and that presented in the first, there are several factors that should be considered in deciding whether for purposes of the rule of this Section the "issue" in the two proceedings is the same, for example:  Is there a substantial overlap between the evidence or argument to be advanced in the second proceeding and that advanced in the first?  Does the new evidence or argument involve application of the same rule of law as that involved in the prior proceeding?  Could pretrial preparation and discovery relating to the matter presented in the first action reasonably be expected to have embraced the matter sought to be presented in the second? . . .
>
> Sometimes, there is a lack of total identity between the matters involved in the two proceedings because the events in suit took place at different times.  In some such instances, the overlap is so substantial that preclusion is plainly appropriate. . . . Preclusion ordinarily is proper if the question is one of the legal effect of a document identical in all relevant respects to another document whose effect was adjudicated in a prior action.

Restatement (Second) of Judgments § 27 cmt. c (1982).  We believe that Florida courts would consider factors like those elaborated in the Restatement comments when determining the identity of issues.

Here, identity of issues is lacking because of differences in the time, location, and terms of the leases. These differences made pretrial preparation and discovery necessarily broader than that required for Noble. Unlike the lease in Noble, created in 1985 for a single store in Osceola County, Florida, leases for the fifty-one Dollar General stores at issue in this case were signed across three decades throughout four states. Interpretation of the leases in this case has not "previously been decided between" Winn-Dixie and Dollar General. Mobil Oil Corp. v. Shevin, 354 So. 2d 372, 374 (Fla. 1977); cf. Rufenacht v. Iowa Beef Processors, Inc., 656 F.2d 198, 203 (5th Cir. Sept. 1981) (refusing to apply collateral estoppel due to non-identical issues when "each claim is referable to a separate and distinct cattle transaction"); id. at 204 n.2 ("[E]stoppel applies [when] there is an actual identity of issues . . . as opposed to the cases at bar which involve separate albeit similar sales of cattle."). Without identity of issues, Winn-Dixie cannot invoke offensive issue preclusion as to the interpretation of the leases involved in this action.

Arguing for collateral estoppel, Winn-Dixie cites only Provau v. State Farm Mutual Automobile Insurance Co., 772 F.2d at 821, in which a panel of this Court interpreted substantive state law by looking to a previous state decision when "the language in the two policies at issue [were] substantially similar." But Provau did not use this analysis in the context of collateral estoppel. Moreover, Provau

52

highlighted "particular judicial concerns" with offensive collateral estoppel that counsel against its broad application.  Id.; see Johnson v. United States, 576 F.2d 606, 614 (5th Cir. 1978) ("[T]he offensive use of collateral estoppel calls for the courts to use special care in examining the circumstances to ascertain that the defendant has in fact had a full and fair opportunity to litigate and that preclusion will not lead to unjust results.").  The district court made no error in refusing to recognize collateral estoppel under Florida law.

3.

Finally, Winn-Dixie challenged the district court's application of the Florida standard for injunctive relief, arguing that the court improperly required that Winn-Dixie show that a remedy at law was inadequate.  Compare Autozone Stores, Inc. v. Ne. Plaza Venture, LLC, 934 So. 2d 670, 673 (Fla. 2d DCA 2006) ("Injunctive relief is normally available to redress violations of . . . restrictive covenants [affecting real property] without proof of irreparable injury or a showing that a judgment for damages would be inadequate.  The value of a restrictive covenant . . . is often difficult to quantify and may be impossible to replace." (alterations in original) (quoting Restatement (Third) of Prop.: Servitudes § 8.3 cmt. b), with Liza Danielle, Inc. v. Jamko, Inc., 408 So. 2d 735, 738 (Fla. 3d DCA 1982) (requiring that a plaintiff seeking to enforce an "exclusivity" clause as a restrictive covenant barring retail competition "prove two interrelated requirements necessary to

53

establish its right to injunctive relief: (1) that it was without an adequate remedy at law, or (2) that it would suffer irreparable harm if the injunction were denied").

Though it required such a showing, the district court concluded that no legal remedy was adequate because Winn-Dixie could not prove damages. Winn-Dixie, 886 F.Supp. 2d at 1348 ("Having rejected Plaintiffs' claim for damages as too speculative and considering my skepticism that Plaintiffs could ever provide sufficient evidence to be entitled to an award of damages, I find that a remedy at law is inadequate."). In this appeal, aside from the challenge to the exclusion of Dr. Pacey's testimony, no party contests the district court's conclusion that a remedy at law was inadequate. Given this finding, Winn-Dixie satisfied the district court's standard. That inadequate remedy at law requirement does not in any way affect the availability of injunctive relief in this case, and Winn-Dixie's argument for a less-stringent test has no effect on the outcome at any store. We thus have no occasion to consider whether the court erred in its application of the Florida injunction standard.

Ultimately, then, we affirm as to the forty-three stores for which the district court denied all relief without reaching the question of whether Defendants violated the grocery exclusives. Because the district court made no error when, for a variety of other reasons, it found it unnecessary to examine whether covenants

had been broken at these locations, we do not disturb its denial of all relief as to these stores.

## IV.

Big Lots and Dollar Tree separately raise a number of issues on cross-appeal. We review the district court's interpretation of state law de novo. Jones, 494 F.3d at 1309. None of the cross-appeals have merit.

## A.

First, Big Lots argues that a Florida statute requires that Big Lots have signed the restrictive covenant to be bound by it. We find no error in the district court's determination that Florida law permits enforcement of the covenants.

Section 542.335 of the Florida Statutes concerns "[v]alid restraints of trade or commerce" -- typically, non-compete agreements. It provides that "[a] court shall not enforce a restrictive covenant unless it is set forth in a writing signed by the person against whom enforcement is sought." Fla. Stat. § 542.335(1)(a) (2011). Big Lots contends that the district court erred in allowing Winn-Dixie to enforce a restrictive covenant against non-signatory stores. But this argument is foreclosed by Winn-Dixie Stores, Inc. v. Dolgencorp, Inc., 964 So. 2d 261 (Fla. 4th DCA 2007), in which a Florida intermediate appellate court held that, with respect to § 542.335(1)(a), "'a restrictive covenant' does not include real property covenants running with the land. Rather, the section is directed at personal service

55

contracts not to compete." Id. at 268. The Florida court in Winn-Dixie

distinguished a case now relied upon by Big Lots, Tusa v. Roffe, 791 So. 2d 512

(Fla. 4th DCA 2001), because "there was no claim in Tusa that the . . . use

restriction was a real property covenant running with the land." Winn-Dixie, 964

So. 2d at 269; see id. ("There is no indication in Tusa that any of the leases were

recorded or that the parties intended to create covenants running with the land.").

But the covenants here ran with the land and section 542.335 does not apply.

Florida law does not require that Winn-Dixie have signed a contract with Big Lots

to enforce its real covenant.

Big Lots argues "that the holding in Winn-Dixie contradicts the clear

mandate of Section 542.335." Big Lots' Reply Br. 3. It urges that the Florida

Supreme Court would read section 542.335 as applying to the restrictive covenant

in this case, or that this Court should certify the question. We disagree. The

holding of the Florida appellate court in Winn-Dixie represents a reasonable

interpretation of a statute that deals with personal, not real, covenants. We see no

"persuasive indication that the state's highest court would decide the issue

otherwise." Studstill, 806 F.2d at 1007 (quoting Provau, 772 F.2d at 820).

Moreover, we do not see sufficient ambiguity to warrant certification. See

Forgione v. Dennis Pirtle Agency, Inc., 93 F.3d 758, 761 (11th Cir. 1996) (per

curiam) (noting that certification is appropriate "[w]hen substantial doubt exists

56

about the answer to a material state law question upon which the case turns"). Because it applied the appropriate Florida case precedent, the district court did not err in allowing Winn-Dixie to enforce a covenant running with the land against non-signatory co-tenants.

B.

Big Lots argues next that Winn-Dixie failed to join indispensable parties -- the shopping center landlords. We review a district court's decision regarding the joinder of indispensable parties for abuse of discretion. United States v. Rigel Ships Agencies, Inc., 432 F.3d 1282, 1291 (11th Cir. 2005) (per curiam); Mann v. City of Albany, Ga., 883 F.2d 999, 1003 (11th Cir. 1989). "A district court abuses its discretion when, in reaching a decision, it applies an incorrect legal standard, follows improper procedures in making the determination, or makes findings of fact that are clearly erroneous." Rigel Ships Agencies, 432 F.3d at 1291 (quoting S.E.C. v. Smyth, 420 F.3d 1225, 1230 (11th Cir. 2005)).

Federal Rule of Civil Procedure 19 sets out two steps for determining whether a party must be joined as indispensable. First, under Rule 19(a), the court determines "whether the person in question is one who should be joined if feasible." Focus on the Family v. Pinellas Suncoast Transit Auth., 344 F.3d 1263, 1280 (11th Cir. 2003) (quoting Challenge Homes, Inc. v. Greater Naples Care Ctr., Inc., 669 F.2d 667, 669 (11th Cir. 1982)). Second, for all such necessary parties, a

57

court determines whether the Rule 19(b) factors permit the litigation to continue if the party cannot be joined, or instead whether they are indispensable.  Id.

First, then, we look to the language of Rule 19(a)(1) to determine if the landlords were necessary parties:

> A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:
>
>> (A) in that person's absence, the court cannot accord complete relief among existing parties; or
>>
>> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>>
>>> (i) as a practical matter impair or impede the person's ability to protect the interest; or
>>>
>>> (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1).

Here, the landlords are not necessary parties under Rule 19(a)(1)(A) because the district court could provide "complete relief" among the litigants without joining the landlords.  Winn-Dixie sought legal and equitable relief in the form of damages or an injunction against Big Lots.  The district court could award all of the requested relief without haling the landlords into court because Big Lots was fully able to pay damages and comply with injunctions.  Cf. Focus on the Family,

58

344 F.3d at 1280 (finding that a party was necessary when "complete relief cannot be afforded in Eller's absence, as PSTA cannot require the running of a particular advertisement on its bus shelters").

Nor does Rule 19(a)(1)(B) require that the landlords be joined. Section (B)(i) does not make the landlords necessary because they had no rights at stake in the litigation that were in danger of being "impair[ed] or imped[ed]" by the case proceeding without them. Big Lots acknowledges that in future litigation the landlords will not be bound by the decision of the district court. Instead, Big Lots urges under section (B)(ii) that, because the landlords were not joined, Big Lots will be subject to "inconsistent obligations." Fed. R. Civ. P. 19(a)(1)(B)(ii). It mistakes the meaning of this term. Big Lots labels as an inconsistent obligation a breach of contract claim against it brought by a landlord. Yet the resolution of a separate contract dispute between Big Lots and its landlord in no way conflicts with the district court's determination that Big Lots violated the grocery exclusive. As a panel of the First Circuit explained:

> "Inconsistent obligations" are not . . . the same as inconsistent adjudications or results. Inconsistent obligations occur when a party is unable to comply with one court's order without breaching another court's order concerning the same incident. Inconsistent adjudications or results, by contrast, occur when a defendant successfully defends a claim in one forum, yet loses on another claim arising from the same incident in another forum.

59

Delgado v. Plaza Las Ams., Inc., 139 F.3d 1, 3 (1st Cir. 1998) (per curiam) (citations omitted); accord Sch. Dist. of City of Pontiac v. Sec'y of U.S. Dep't of Educ., 584 F.3d 253, 282 (6th Cir. 2009) (en banc) ("Inconsistent obligations arise only when a party cannot simultaneously comply with the orders of different courts."); Cachil Dehe Band of Wintun Indians of the Colusa Indian Cmty. v. California, 547 F.3d 962, 976 (9th Cir. 2008) ("We adopt the approach endorsed by the First Circuit [in Delgado].").

Moreover, where two suits arising from the same incident involve different causes of action, defendants are not faced with the potential for double liability because separate suits have different consequences and different measures of damages. See In re Torcise, 116 F.3d 860, 866 (11th Cir. 1997). Here, the case on appeal involves claimed violations of the restrictive covenants, while Big Lots complains of secondary suits from landlords alleging breach of lease contracts. Big Lots does not face section (B)(ii) "inconsistent obligations," and has no other Rule 19(a) hook on which to hang its mandatory joiner hat. As a result, we need not reach the second step to consider, under Rule 19(b), "whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. Pro. 19(b). The district court did not abuse its discretion in refusing to dismiss the case for failure to join the landlords.

C.

60

Finally, Big Lots argues that Winn-Dixie cannot enforce its restrictive covenants because it neglected to make "a reasonable demand for compliance with the restriction after the breach has occurred." Majestic View Condo. Ass'n v. Bolton, 429 So. 2d 438, 439 (Fla. 4th DCA 1983). We find no pre-suit demand requirement here because the cases relied upon by Big Lots concern materially different species of covenants. Big Lots first points to Richards v. Dodge, 150 So. 2d 477, 483 (Fla. 2d DCA 1963), in which a residential tenant raised breach of covenants as an affirmative defense in a landlord's action for unpaid rent. The court found that the tenant was estopped from asserting the defense because she had failed to notify the landlord that she objected to the presence of a male co-tenant. Id. at 484-85. The Florida court noted that "[d]emand for performance is a necessary prerequisite to breach insofar as affirmative covenants are concerned." Id. Richards added a caveat that "[n]otice of breach and demand of performance are not required of the covenantee in order to entitle him to action against the covenantor upon breach of his covenant, unless the event upon which the action accrues is mainly or exclusively within the knowledge of the covenantee." Id. at 483 (quoting 21 C.J.S. Covenants § 88 (1940)). But, Richards, which addressed only affirmative covenants, does not impose a pre-suit demand requirement for Winn-Dixie's enforcement of restrictive covenants running with the land. Moreover, the caveat makes demand unnecessary because the alleged breach of the

61

grocery exclusives was not "mainly or exclusively within the knowledge of" Winn-Dixie, the covenantee seeking enforcement.  Big Lots was on notice of the restrictive covenants and was best positioned to know its own inventory.  Even if the test in Richards applied, Winn-Dixie need not have made demand.

Big Lots also looks to Majestic View, in which a condominium association sued unit owners for violating a restrictive covenant limiting pets to "one dog or cat under twenty-five pounds."  429 So. 2d at 439.  A Florida appellate court reversed a trial court that had applied a "due process" test requiring "a condominium association to provide a unit owner with an adversary proceeding before seeking to enforce its restrictive covenants in court."  Id. at 439-40.  Finding no basis in law for imposing such a due process test, the court noted that the condo association had given the residents pre-suit notice of the violation.  Id.  Without explanation or analysis, the court cited Richards in noting that enforcement of the restrictive covenant required "a reasonable demand for compliance with the restriction after the breach has occurred."  Id. at 439.

Majestic View involved the special relationship among a condominium association and its constituent unit owners.  See id. at 440 ("Condominium unit owners comprise a little democratic sub society of necessity more restrictive as it pertains to use of condominium property than may be existent outside the condominium organization." (quoting Hidden Harbour Estates, Inc. v. Norman,

62

309 So. 2d 180 (Fla. 4th DCA 1975)).  The only other Florida case in this vein, Europco Management Co. of America v. Smith, 572 So. 2d 963, 966-67 (Fla. 1st DCA 1990), similarly concluded that a residential developer did not owe any more due process to homeowners when enforcing restrictive covenants than outlined in Majestic View.  Id. ("The undisputed facts of this case show that Europco complied with all necessary due process requirements for enforcement of a protective covenant such as involved in this case. See Majestic View . . . .").

Winn-Dixie is a commercial tenant whose covenant limiting competition within a shopping center arises in a far different context than the residential restrictions enforced by the condominium association in Majestic View and the residential management company in Europco.  And both Majestic View and Europco refused to impose burdensome "due process" requirements for enforcing covenants.  Regardless, even if these cases imposed a pre-suit demand requirement here, the exception in Richards would relieve any need for demand because violations at Big Lots stores were not "mainly or exclusively within the knowledge of" Winn-Dixie.

Buttressing this conclusion, not a single Florida case has barred enforcement of a restrictive covenant for want of demand.  When commercial parties seek to enforce restrictive covenants involving the operation of grocery stores and similar establishments, as best as we can tell, the Florida courts have made no mention of

63

any demand requirement.  See Eckerd Corp. v. Corners Grp., Inc., 786 So. 2d 588, 590 (Fla. 5th DCA 2000); AC Assocs. v. First Nat'l Bank of Fla., 453 So. 2d 1121, 1124 (Fla. 2d DCA 1984); Norwood Shopping Ctr., 135 So. 2d at 449; see also Massari v. Salciccia, 102 Fla. 847, 852 (1931).  In Dolgencorp, the Florida court noted that Winn-Dixie had made a demand upon the landlord, but made no mention of any demand made on the dollar store defendant.  964 So. 2d at 263. Courts around the country have considered whether and how to enforce similar restrictive covenants without mentioning a demand requirement.  See, e.g, Tippecanoe Assocs. II, LLC v. Kimco Lafayette 671, Inc., 829 N.E.2d 512, 513 (Ind. 2005); Davidson Bros., Inc. v. D. Katz & Sons, Inc., 643 A.2d 642, 643 (N.J. Super. Ct. App. Div. 1994); Blueberries Gourmet, Inc. v. Aris Realty Corp., 291 A.D.2d 520 (N.Y. App. 2002); Great Atl. & Pac. Tea Co. v. Bailey, 220 A.2d 1, 2 (Pa. 1966); Foods First, Inc. v. Gables Assocs., 418 S.E.2d 888, 889 (Va. 1992). The district court did not err in enforcing the restrictive covenant without a pre-suit demand.

Because Florida law imposed no pre-suit demand requirement on Winn-Dixie for enforcement of the restrictive covenants, we have no occasion to consider whether Big Lots waived this argument by not pleading it as an affirmative defense.  See Fed. R. Civ. P. 9(c) ("[W]hen denying that a condition precedent has occurred or been performed, a party must do so with particularity.")

64

D.

In its lone issue on cross-appeal, Dollar Tree argues that the Florida statute of limitations precluded Winn-Dixie from enforcing its restrictive covenants because the continuing tort doctrine should not apply. We review the district court's grant of summary judgment on an affirmative defense de novo. See Capone v. Aetna Life Ins. Co., 592 F.3d 1189, 1194 (11th Cir. 2010).

Florida applies a five-year limitations period to actions to enforce a restrictive covenant. Fla. Stat. § 95.11(2)(b); Pond Apple Place III Condo. Ass'n v. Russo, 841 So. 2d 526, 527 (Fla. 4th DCA 2003). Here, however, the district court applied "the doctrine of continuing tort" because "each day Plaintiffs' grocery exclusives were allegedly violated resulted in a distinct, separate breach of the restrictive covenant." The continuing tort doctrine, or the continuing violation principle, distinguishes between a single act that causes multiple, cascading harms, and recurrent, repetitive acts excepted from the running of the statute of limitations: "A continuing tort is 'established by continual tortious acts, not by continual harmful effects from an original, completed act.'" Suarez v. City of Tampa, 987 So. 2d 681, 686 (Fla. 2d DCA 2008) (quoting Horvath v. Delida, 540 N.W.2d 760, 763 (Mich. Ct. App. 1995)).

Dollar Tree reasons that, because Winn-Dixie brings contract, not tort claims, there is no continuing "tort." But Florida law does not so clearly

65

distinguish between covenant-enforcement actions and tort suits for purposes of the continuing violation principle. Dollar Tree cites contract cases in which courts found that the cause of action accrued at the first breach, with no applicable continuing violation principle. See Garden Isles Apts. No. 3, Inc. v. Connolly, 546 So. 2d 38, 41 (Fla. 4th DCA 1989); see also Servicios De Almacen Fiscal Zona Franca y Mandatos S.A. v. Ryder Int'l, Inc., 264 F. App'x 878, 880 (11th Cir. 2008) (per curiam) (unpublished). In turn, Winn-Dixie points to cases involving torts, such as nuisance and trespass, in which Florida courts recognize a continuing violation rule, see Carlton v. Germany Hammock Groves, 803 So. 2d 852, 854-56 (Fla. 4th DCA 2002), and to cases involving affirmative covenants, see City of Quincy v. Womack, 60 So. 3d 1076, 1078 (Fla. 1st DCA 2011) ("In asserting that the limitations period had expired, the City ignores the continuing nature of its obligations under the contract, and that its ongoing nonperformance constituted a continuing breach while the contract remained in effect. The appellee's cause of action was not limited to the City's initial breach, and the section 95.11(2)(b) statute of limitations had not expired when the appellee filed his lawsuit which encompassed the City's continuing breach.").

No Florida authority has addressed whether the continuing violation doctrine applies to restrictive covenants running with the land. Because Florida courts look to decisions from around the country in applying the continuing tort doctrine, the

66

parties turn to out-of-state cases.  See, e.g., Suarez, 987 So. 2d at 686.  Winn-Dixie cites Barker v. Jeremiasen, 676 P.2d 1259, 1260-61 (Colo. App. 1984), in which a plaintiff neighbor sued to enforce a restrictive covenant against a horse farm for violation of a restrictive covenant providing that the property was not to contain more than twenty head of livestock.  The Colorado intermediate appeals court stated:  "We agree with the trial court that defendants' horse operation resulted in repeated and successive breaches of the continuing protective covenants which continued until the date of trial.  Thus, the statute of limitations . . . does not bar this action for breach of covenant."  Id. at 1261.

Similarly, in Black Island Homeowners Ass'n v. Marra, 588 S.E.2d 250, 251-52 (Ga. Ct. App. 2003), plaintiffs sued to enforce a restrictive covenant requiring that land be maintained in its native state when defendants had periodically mowed grass.  The Georgia court distinguished between two types of cases: those in which a defendant had erected a permanent fixture violating a covenant, when the cause of action "accrues when the violation first results," and cases in which a defendant commits a "distinct, separate act that constitutes an alleged breach each time it occurs."  Id. at 253.  In the latter type, the court agreed with the trial court that the statute of limitations does not bar recovery because "each incidence of mowing gives rise to a new cause of action."  Id.  The most relevant out-of-state case cited by Dollar Tree tracked this distinction: an

67

Oklahoma court did not consider the continuing violation doctrine when a fixture, a "modular home," violated a restrictive covenant that prohibited buildings near property lines.  Russell v. Williams, 964 P.2d 231 (Okla. Civ. App. 1998).

Based on the parallel application of the continuing tort doctrine in Florida and persuasive precedent from other states, we believe that Florida law recognizes a continuing violation principle when restrictive covenants are violated by ongoing, separate acts.  Cf. Carlton, 803 So. 2d at 855-56 (applying the continuing tort doctrine to nuisance and trespass actions by distinguishing between permanent injuries and reoccurring injuries to a property owner's land).  Applying this continuing violation principle, we must determine whether Dollar Tree's sale of products allegedly in violation of a Winn-Dixie restrictive covenant amounts to many discrete acts (measured daily, as the district court found), or instead one overarching violation dating to the opening of the store.  We believe the analogy to the multiple-violation cases involving horses (Barker) and mowing (Black Island) to be far more compelling than the comparison to single-violation permanent fixture cases, such as those involving mobile homes (Russell).  The violation here arises from what is being continuously stocked and sold in Dollar Tree stores. Winn-Dixie takes no issue with the permanent shelves as such; the violation stems from the repeated activities that Dollar Tree conducts on those shelves.  Just as keeping more than thirty horses on the land in Barker amounted to repeated and

68

successive breaches, the continued offering of more than 500 square feet of groceries for sale represents discrete, separate breaches of the covenant.

Finally, Dollar Tree argues that the district court erred in granting summary judgment on the statute of limitations defense because material facts remained in dispute. Florida courts have repeatedly stated that the question of "[w]hether the continuing torts doctrine applies to the facts of a case is for a trier of fact to decide." Pearson v. Ford Motor Co., 694 So. 2d 61, 67-68 (Fla. 1st DCA 1997). For example, in Carlton, the Florida appellate court refused to grant summary judgment recognizing an affirmative defense because the plaintiff had "alleged sufficient facts with regards to the flooding and resulting damage occurring in the four years preceding the date suit was filed so as to urge application of the continuing torts doctrine and preclude summary judgment." 803 So. 2d 856; see Halkey-Roberts Corp. v. Mackal, 641 So. 2d 445, 447 (Fla. 2d DCA 1994) ("The question of whether [Defendants'] actions constituted continuing torts precludes the granting of summary judgment as to counts I and II. To what extent, if any, the concept applies to this case is an issue for the trier of fact to decide."). Typically, these cases involve the denial of a defendant's motion for summary judgment when the plaintiff presents facts suggesting the continuing tort doctrine may apply. Here, however, Dollar Tree did not dispute material facts before the district court. Instead, it made purely legal arguments explaining why the continuing tort doctrine

69

did not apply. Because this legal position was unsuccessful, the district court was left with no material facts in dispute, and thus did not err in granting Winn-Dixie summary judgment on the defense.

Two key material facts could be at issue in a case involving the continuing tort doctrine: whether any acts took place within the limitations period; and whether these acts were sufficiently similar to qualify as "continuing" the prior events. See Rindley v. Gallagher, 890 F. Supp. 1540, 1549 (S.D. Fla. 1995) ("To establish a continuing violation, the plaintiff must show a substantial nexus between the time barred acts and the timely asserted acts."). Here, unlike in the many cases denying summary judgment, no dispute exists as to either type of fact. There is no dispute that the acts continued up to a point well within the limitations period. Nor do the parties dispute that the repeated stocking and selling of challenged items at Dollar Tree stores remained largely consistent in manner and scope. As a result, the only issue raised was a pure question of law: whether a violation of a covenant restricting grocery sales could qualify as a continuing violation measured each day, or was instead a discrete violation that occurred when a store first established its shelving arrangements. With no material facts in dispute, the district court did not err in granting Winn-Dixie summary judgment as a matter of law.

V.

70

In sum, we hold that, for forty-one Florida stores, the district court misapplied Florida law in determining whether Defendants had violated Winn-Dixie's restrictive covenants.[29] For these stores, we reverse and remand for a new trial based on a definition of "staple or fancy groceries" and "sales area" consistent with the holding of the Florida Third District Court of Appeals in 99 Cent. We also hold that the district court applied incorrect state law in determining whether the Defendants had violated the terms of restrictive covenants at thirteen stores in Alabama and Georgia.[30] We reverse and remand for interpretation of covenants binding these Alabama and Georgia stores in accordance with the appropriate law of each state. We affirm as to the forty-three remaining stores for which the district denied all relief on other grounds.[31]

---

[29] BL505/WD506; BL512/WD2210; BL525/WD698; BL530/WD654; BL550/WD609; BL553/WD236; BL555/WD307; BL558/WD160; BL1519/WD306; BL1628/WD348; BL1711/WD302; BL4258/WD254; DG1056/WD489; DG1416/WD622; DG1453/WD662; DG1541/WD629; DG2634/WD777; DG2969/WD681; DG7376/WD737; DG8551/WD561; DT332/WD2311; DT723/WD254; DT807/WD657; DT892/WD2230; DT986/WD737; DT1566/WD228; DT2117/WD353; DT2159/WD309; DT2714/WD2205; DT2804/WD84; DT2838/WD412; DT4181/WD678; DT4199/WD255; DT4230/WD656; DT4266/WD501; DT4339/WD632; DT4365/WD236; DT4497/WD378; DT4511/WD647; DT4550/WD658; DT4625/WD577.

[30] DG246/WD478; DG2965/WD428; DG4952/WD599; DG8665/WD579; DG11814/WD574; DT153/WD463; DT582/WD166; DT2160/WD443; DT2395/WD461; DT2936/WD599; DT3382/WD514; DT4133/WD456; DT4637/WD471.

[31] BL554/WD671; BL570/WD612; DG626/WD1537; DG770/WD1540; DG1026/WD1511; DG1095/WD209; DG1322/WD612; DG1333/WD151; DG1382/WD30; DG1389/DG710; DG1402/WD2260; DG1413/WD631; DG1420/WD611; DG1421/WD144; DG1451/WD723; DG1456/WD331; DG1493/WD647; DG1513/WD2326; DG1522/WD2268; DG1524/WD566; DG1649/WD2342; DG2363/WD411; DG2685/WD1572; DG2762/WD652; DG3013/WD713;

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

---

DG4008/WD553; DG4444/WD2213; DG4701/WD649; DG4821/WD3; DG4981/WD221; DG7268/WD123; DG7457/WD167; DG7539/WD577; DG7584/WD639; DG7824/WD1588; DG7883/WD305; DG9149/WD750; DG9263/WD705; DG10357/WD1431; DG10484/WD654; DT1135/WD116; DT1805/WD705; DT2161/WD1555.